[Crim. No. 2659.   First Dist., Div. Two.   Jan. 15, 1951.]

THE PEOPLE, Appellant, v. RICHARD NORTON HOPKINS, Respondent.

Fred N. Howser, Attorney General, Clarence A. Linn, Deputy Attorney General, Edmund G. Brown, District Attorney, and Janet Aitken, Deputy District Attorney, for Appellant.

J. Maxwell Peyser for Respondent.

SCHOTTKY, J. pro tem.—By an indictment respondent was accused of manslaughter in that he "did wilfully, unlawfully, feloniously and without malice kill one Herbert Caro."

After pleading not guilty respondent was permitted to withdraw his plea, whereupon he moved to set aside the indictment on the ground that it was returned without reason-

able or probable cause. His motion was granted, and this appeal was taken by the People. (Pen. Code, § 1238.)

The transcript of the grand jury hearing which was before the court on the motion shows that six witnesses testified.

The cause of death appears from the testimony of the doctor on duty at the Park Emergency Hospital in San Francisco early Sunday morning, September 18, 1949, when decedent was brought in by respondent in his car. He diagnosed the case as one of narcotic poisoning, and learned from respondent that decedent had taken heroin. After emergency treatment decedent was taken to the San Francisco Hospital where he died that day.

An inspector of the San Francisco Police Department on the homicide detail was the principal witness before the grand jury. He testified that he investigated the case on the day of decedent's death and took a statement from respondent. The substance of it, according to the officer's testimony, was that on September 17 respondent left his ship in the early afternoon and after going over to Marin County returned to San Francisco about 11:30 p. m. About an hour later he visited a tavern where he saw decedent whom he had known for approximately three years. They engaged in conversation and after respondent had told decedent about his voyage decedent asked him "if he would like to get high to-night" to which he assented and they left the place in respondent's car. Respondent gave decedent $13 and about 15 minutes later decedent returned to the car, having purchased some heroin. They then drove out to Funston Avenue where they stopped, opened the package, and decedent produced an eye-dropper which he filled with water at a service station. They drove around a few blocks and then parked on 14th Avenue beside the Park-Presidio Boulevard "where they took a cap of heroin and mixed it in a spoon, heated it, and after they had it mixed, Hopkins said he took a shot in the arm, and then he said Caro took a shot, *he held his arm with a handkerchief. Q. Hopkins said he held Caro's arm? A. Yes. He had wrapped a handkerchief around it to force the veins out.* And that Hopkins took a shot. He said he took another one, and that Hopkins took another one. The first one he thought he took in the arm, and the second one somewhere down around the wrist. After—Hopkins—after Caro took the second shot, he said he felt sick, so he got out of the car and attempted to heave. He wasn't able to. And he said, Hop-

kins said, he got out, walked around the front of the car, and that Caro was practically unconscious then, he had to drag him back into the car, put him in the back seat, and from there he drove him to the Park Emergency Hospital, where he was admitted and treated by doctors.'' (Emphasis added.)

The district supervisor of the Federal Narcotics Bureau for the states of California and Nevada also testified before the grand jury. He described the several methods used in taking heroin, one of which is to inject it by needle directly into the vein on the inner surface of the arm. To get the quickest reaction the vein is forced to the surface by the application of a tourniquet or by manual pressure. A handkerchief is often used as a tourniquet, he said.

Section 11721, Health and Safety Code, as it was in effect on September 18, 1949, the date of Caro's death, read as follows:

"A narcotic addict, as defined in Section 11009 of the Health and Safety Code, is punishable by imprisonment in the county jail for not less than three nor more than six months."

Section 11009 of the same code then read: " 'Addict' as used in this division, means a person who unlawfully uses or is addicted to the unlawful use of narcotics."

When decedent injected the heroin into his own arm he violated said sections 11721 and 11009, and when respondent manipulated the handkerchief-tourniquet around decedent's arm he assisted him in the commission of an unlawful act not amounting to a felony. As a result of these acts decedent died.

Section 192, Penal Code, defines manslaughter as "the unlawful killing of a human being, without malice. It is of three kinds: . . . 2. Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; . . ."

Section 31, Penal Code, provides that "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals."

The help which respondent gave decedent brings respondent within the provisions of section 31. That he aided is clear; that he abetted is equally clear, since he and decedent had deliberately set out together with the purpose of doing

that which section 11721 denounced. (See *People* v. *Dole,* 122 Cal. 486, 492 [55 P. 581, 68 Am.St.Rep. 50].)

In order to charge respondent with manslaughter it was not necessary for the testimony before the grand jury to show that *he* injected the heroin, since section 31 draws no line between persons who ''directly commit the act constituting the offense'' and those who *''aid and abet in its commission.''* Both are principals.

If respondent had not touched decedent's arm or otherwise physically aided him, but had merely stood by and kept a lookout for passers-by he could still be charged as a principal under section 31, Penal Code. (*People* v. *Wilson,* 93 Cal. App. 632, 636 [269 P. 951]; *People* v. *Wade,* 71 Cal.App.2d 646, 651 [163 P.2d 59], and its citations; see, also, *People* v. *Mummert,* 57 Cal.App.2d 849 [135 P.2d 665].)

*People* v. *Le Grant,* 76 Cal.App.2d 148, 154 [172 P.2d 554], cited by appellant, is in point. In a fight between a companion of Le Grant and another man the latter was killed. Le Grant struck no blow but, while his companion was engaged in the affray, stood by on the sidelines ''to keep other people back who might have 'butted in' and have thus prevented the tragedy. By so doing he acted with full knowledge that an assault and battery was in progress, the reasonable and natural consequence of which might be a serious injury to, or possibly the death of, either or both of the combatants. Such a course of conduct on the part of Le Grant constituted an aiding and abetting of Vincent in the unlawful assault and battery and resulting homicide, thus making him also liable as a principal for the crime of involuntary manslaughter. [citations].'' His conviction of manslaughter was affirmed.

Two cases sharply illustrate the question now under discussion because in each of them the defendant was legally incapable of directly committing the act constituting the offense but was nevertheless held as a principal because such defendant aided and abetted. They are *People* v. *Bartol,* 24 Cal.App. 659 [142 P. 510] and *In re Kantrowitz,* 24 Cal.App. 203 [140 P. 1078]. Both cases were cited approvingly in *People* v. *Wallin,* 32 Cal.2d 803 at 807 [197 P.2d 734], where *People* v. *Young,* 132 Cal.App. 770 [23 P.2d 524] is likewise cited.

Respondent's brief does not attempt to answer the argument of appellant which is illustrated and supported by *People* v. *Le Grant, supra* (and by the Bartol, Kantrowitz and Young cases), that one who aids and abets may be prosecuted

708

as a principal. Respondent apparently relies solely on the point that he did not actually inject the needle in decedent's arm.

Section 921 of the Penal Code provides: "The grand jury ought to find an indictment when all the evidence before them, taken together, if unexplained and uncontradicted, would, in their judgment, warrant a conviction by a trial jury."

It is said in *Greenberg* v. *Superior Court*, 19 Cal.2d 319 at page 322 [121 P.2d 713]: "It has long been settled in most jurisdictions that an indictment is invalid if it is unsupported by any evidence before the grand jury. (See cases collected in 59 A.L.R. 567.) If there is some evidence to support the indictment, the courts will not inquire into its sufficiency (see cases collected in 59 A.L.R. 573) . . ."

As this court said in *Davis* v. *Superior Court*, 78 Cal.App. 2d 25 at p. 27 [177 P.2d 314]:

" 'It has long been settled in most jurisdictions that an indictment is invalid if it is unsupported by any evidence before the grand jury. (See cases collected in 59 A.L.R. 567). If there is some evidence to support the indictment the courts will not inquire into its sufficiency (see cases collected in 59 A.L.R. 573) . . .'

"It has long been settled that in the analogous case of an information the evidence before the committing magistrate is not subject to the same test as that before a trial jury in a criminal case and probable cause may be found for the holding to answer although the evidence does not establish the defendant's guilt beyond a reasonable doubt. All that is required is a reasonable probability of the defendant's guilt. (*People* v. *Mitchell*, 27 Cal.2d 678, 681 [166 P.2d 10]; *People* v. *Wisecarver*, 67 Cal.App.2d 203, 209 [153 P.2d 778]; 7 Cal. Jur. 982.)

"The Supreme Court in *Greenberg* v. *Superior Court*, *supra*, did not explain whether it thought that the same rule should apply in the case of an indictment as in the case of an information. It at least indicated that no severer rule should be applied when it used the language above quoted."

We are satisfied that with the testimony that the grand jury had before it there was reasonable and probable cause for the finding of a true bill, and that the trial court erred in granting the motion to dismiss the indictment.

The order dismissing the indictment is reversed with directions to the trial court to deny the motion to dismiss.

Nourse, P. J., and Dooling, J., concurred.