[No. A040043. First Dist., Div. Three. May 5, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
CAROL ANN OLIVER, Defendant and Appellant.

142

**COUNSEL**

Harvey R. Zall, State Public Defender, under appointment by the Court of Appeal, and Irene Kiebert, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, David D. Salmon and Violet M. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**STRANKMAN, J.**—The victim, Carlos Cornejo, became acquainted with appellant Carol Ann Oliver at a bar. He accompanied her to her home and injected himself with heroin in her bathroom. He then collapsed to the floor unconscious. Appellant had her daughter drag him outside the house. The next morning he was discovered dead in the yard. The cause of death was heroin overdose.

Appellant was charged with and, following a jury trial, convicted of involuntary manslaughter (Pen. Code, § 192, subd. (b))[1] and receiving stolen property (§ 496). A three-year, eight-month sentence was imposed. We affirm.

### I

### *Facts*

Appellant met Cornejo on the afternoon of July 6, 1986, when she was with her boyfriend at a bar in the City of Pleasant Hill. She and her boyfriend purchased jewelry from Cornejo. In the late afternoon, when appellant was leaving the bar to return home, Cornejo got into the car with her, and she drove home with him. At the time, he appeared to be extremely drunk. At her house, he asked her for a spoon and went into the bathroom. She went to the kitchen, got a spoon and brought it to him. She knew he wanted the spoon to take drugs. She remained in the living room while Cornejo "shot up" in the bathroom. He then came out and collapsed onto the floor in the living room. She tried but was unable to rouse him.

Appellant then called the bartender at the bar where she had met Cornejo. The bartender advised her to leave him and to come back to the bar, which appellant did.

Appellant's daughter returned home at about 5 p.m. that day with two girlfriends. They found Cornejo unconscious on the living room floor. When the girls were unable to wake him, they searched his pockets and found eight dollars. They did not find any wallet or identification. The daughter then called appellant on the telephone. Appellant told her to drag Cornejo outside in case he woke up and became violent. The girls dragged Cornejo outside and put him behind a shed so that he would not be in the view of the neighbors. He was snoring when the girls left him there.

---

[1] All further statutory references are to the Penal Code unless indicated otherwise.

About a half hour later, appellant returned home with her boyfriend. She, the boyfriend, and the girls went outside to look at Cornejo. Appellant told the girls that she had watched him "shoot up" with drugs and then pass out.

The girls went out to eat and then returned to check on Cornejo later that evening. He had a pulse and was snoring.

In the morning, one of the girls heard appellant tell her daughter that Cornejo might be dead. Cornejo was purple and had flies around him. Appellant called the bartender at about 6 a.m. and told her she thought Cornejo had died in her backyard. Appellant then told the girls to call the police and she left for work. The police were called.

Officer Mark Eggold arrived at appellant's house on July 7. After he found Cornejo's body outside, he searched the residence. In the bathroom, he found some tissue stained with blood. In the kitchen, he found a spoon with a blackish-gray residue on it, and a flat rubber strap in a kitchen drawer. He also found a travel case containing drug paraphernalia.

Later that day, appellant complied with a request to answer questions at the police station. After changing her version of events several times, she finally told the police that Cornejo was extremely drunk when she drove him to her home. He went into the bathroom and asked for a spoon, which she gave him. Cornejo "shot up" and then collapsed. She said she believed that he had collapsed from the injection of drugs, and that he had "hot-shotted."

On July 8, appellant delivered some jewelry to a friend. She told her friend she had taken the jewelry off a man who had died of a drug overdose at her house. She asked her friend to keep the jewelry for her temporarily. The friend delivered the jewelry to the police.

An autopsy revealed that Cornejo died of morphine poisoning. The heroin (which shows up in the blood as morphine) was injected shortly before his death. Cornejo also had a .28 percent blood-alcohol level. The forensic pathologist who testified at trial was reasonably certain that Cornejo's death was not caused by the alcohol.

## II

### Prosecution of Involuntary Manslaughter Charge

Section 192, subdivision (b), defines involuntary manslaughter as manslaughter (1) in the commission of an unlawful act not amounting to a

felony (misdemeanor/manslaughter); or (2) in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection (criminal negligence). Here, the People prosecuted the charge of involuntary manslaughter under both theories of section 192, subdivision (b).

As to the first theory, the prosecution contended appellant had aided and abetted Cornejo in the commission of a violation of Health and Safety Code section 11550 (use of controlled substance).[2] As to the second theory, the prosecution contended that appellant was criminally negligent when she failed to summon medical aid for Cornejo and then abandoned him, when she must have known he needed medical attention.

At a pretrial *in limine* hearing, the prosecutor sought to reserve the right to introduce evidence during his case-in-chief that appellant had sold or furnished drugs to Cornejo, an offense under Health and Safety Code section 11352.[3]

The trial court ruled this evidence inadmissible, explaining that the prosecutor had elected to charge appellant under Health and Safety Code section 11550 instead of section 11352, and that he would have to abide by that election. The trial court clarified, however, that evidence that appellant had helped to *inject* Cornejo would be admissible as relevant to the aiding and abetting a misdemeanor theory.

At trial, appellant did not testify. Evidence was introduced of appellant's statements to the police concerning her ex-husband's death caused by a drug overdose in 1978. Police Sergeant Harper testified that in 1978 appellant had told him that although she had not been with her ex-husband at the time of his death, she thought he had used heroin to counter the effects of crank, and that his system had overloaded. Appellant was upset that the people who were with him had delayed in seeking medical help.

At the close of the prosecution's case, defense counsel moved for a judgment of acquittal (§ 1118.1) on the involuntary manslaughter charge. As to the misdemeanor/manslaughter theory, he argued there was no evidence of the criminal intent necessary to establish aiding and abetting. As to the

---

[2] Health and Safety Code section 11550 states in pertinent part: "No person shall use, or be under the influence of any controlled substance . . . . Any person convicted of violating any provision of this subdivision is guilty of a misdemeanor and shall be sentenced to serve a term of not less than 90 days or more than one year in the county jail."

[3] Health and Safety Code section 11352 provides in pertinent part: ". . . [E]very person who transports, imports into this state, sells, furnishes, administers, or gives away . . . any controlled substance . . . shall be punished by imprisonment in the state prison for three, four, or five years."

criminal negligence theory, he argued that the evidence failed to establish a duty of care owed by appellant to Cornejo because there was no special relationship between them, and that absent a duty of care there was no negligence.

The trial court ruled that as to the misdemeanor/manslaughter theory, there was ample evidence to support the finding that appellant had intended to facilitate, and therefore had aided and abetted Cornejo's use of drugs; and that as to the criminal negligence theory, there was sufficient evidence of a duty owed. The trial court accordingly denied the motion for judgment of acquittal.

The jury was instructed on the two theories of involuntary manslaughter.[4] The verdict finding appellant guilty of involuntary manslaughter did not specify the theory or theories upon which the jury based its verdict.

## III

*The Evidence Supports the Trial Court's Denial of the Section 1118.1 Motion and the Conviction of Involuntary Manslaughter*

■ A. *As to the criminal negligence theory, the evidence supports the trial court's determination that appellant owed a duty to seek medical attention for Cornejo, and there was substantial evidence of criminal negligence.* ■ Criminal negligence is premised on conduct more reckless and culpable than that of "ordinary," or civil negligence. The conduct must be such a sharp departure from the conduct of an ordinarily prudent person that it evidences a disregard for human life, and raises a presumption of conscious indifference to the consequences. (See *People* v. *Watson* (1981) 30

---

[4] As to the theory of criminal negligence, the jury was instructed in part as follows: "The term 'without due caution and circumspection' as used in these instructions refers to negligent acts which are aggravated, reckless and gross and which are such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be contrary to a proper regard for human life or, in other words, a disregard for human life or an indifference to consequences. . . .

"The act [constituting criminal negligence] must be one which has knowable and apparent potentialities for resulting in death. Mere inattention or mistake of judgment resulting even in death of another is not criminal unless the quality of the act makes it so. The fundamental requirement fixing criminal responsibility is knowledge, actual or imputed, that the act of the accused tended to endanger life. . . .

"In determining whether the defendant's failure to summon medical assistance rose to the level of criminal negligence, you should consider whether an ordinarily prudent person, put in the place of the defendant, and confronted with the same circumstances as the defendant, including but not limited to the intoxicated state of Carlos Cornejo due to his voluntary ingestion of alcohol, and his apparent state of sleep, would have reasonably known at that time that Carlos Cornejo was helpless and in danger of death or great bodily harm."

Cal.3d 290, 296 [179 Cal.Rptr. 43, 637 P.2d 279]; *People* v. *Penny* (1955) 44 Cal.2d 861, 879 [285 P.2d 926]; *In re Michael B.* (1983) 149 Cal.App.3d 1073, 1088 [197 Cal.Rptr. 379].)

■ A necessary element of negligence, whether criminal or civil, is a duty owed to the person injured and a breach of that duty. ■ Appellant claims that, regardless of whether her conduct evidenced a disregard for Cornejo's life, she did not cause his condition and therefore as a matter of law did not owe him any duty to seek medical care. She contends the question of whether her conduct amounted to criminal negligence therefore should never have gone to the jury.

■ Generally, one has no legal duty to rescue or render aid to another in peril, even if the other is in danger of losing his or her life, absent a special relationship which gives rise to such duty. (*Williams* v. *State of California* (1983) 34 Cal.3d 18, 23-24 [192 Cal.Rptr. 233, 664 P.2d 137]; see 1 LaFave & Scott, Substantive Criminal Law (1986) Omission to Act, § 3.3, p. 282; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 858, pp. 220-221.) Further, "[t]he fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." (Rest.2d Torts, § 314.)

■ In California civil cases, courts have found a special relationship giving rise to an affirmative duty to act where some act or omission on the part of the defendant either created or increased the risk of injury to the plaintiff, or created a dependency relationship inducing reliance or preventing assistance from others. (See *Clemente* v. *State of California* (1985) 40 Cal.3d 202, 212-213 [219 Cal.Rptr. 445, 707 P.2d 818]; *Johnson* v. *State of California* (1968) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352]; *Carlisle* v. *Kanaywer* (1972) 24 Cal.App.3d 587, 592 [101 Cal.Rptr. 246].) Where, however, the defendant took no affirmative action which contributed to, increased, or changed the risk which would otherwise have existed, and did not voluntarily assume any responsibility to protect the person or induce a false sense of security, courts have refused to find a special relationship giving rise to a duty to act. (See *Williams* v. *State of California, supra,* 34 Cal.3d 18, 27-28.)

The Restatement Second of Torts provides guidelines as to the specific kinds of conduct which will require one to take affirmative action to render aid. Section 321 provides: "(1) If the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect. [¶] (2) The rule stated in Subsection (1)

applies even though at the time of the act the actor has no reason to believe that it will involve such a risk."

Section 324 of the Restatement Second of Torts provides in part: "One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by [¶] (a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge . . . ."

*Johnson* v. *County of Los Angeles* (1983) 143 Cal.App.3d 298 [191 Cal.Rptr. 704], illustrates the application of section 321 of the Restatement cited above. There, the complaint alleged that sheriff's officers arrested the decedent for driving on the wrong side of a freeway in an attempt to commit suicide. Shortly thereafter, the wife of the decedent informed the officers that the decedent was a paranoid schizophrenic who required immediate medication to correct his suicidal tendencies. The decedent was subsequently released from custody without notice to his wife or daughter, and two days later he committed suicide. The wife and daughter brought an action against the county and the sheriff's officers, alleging that they violated their duties to confine, medicate and summon medical care for decedent, as well as their duty to warn them of the decedent's release from custody. The trial court sustained the defendants' demurrer on the grounds the complaint failed to state a cause of action.

On appeal, the court reversed. The court held the complaint alleged facts of a special relationship between the sheriff's officers and the decedent as well as the wife and daughter which gave rise to a duty to warn the wife and daughter before releasing the decedent. The court found that under the circumstances alleged, because the wife and daughter depended upon the sheriff's officers for protection against the very eventuality that occurred, and the sheriff's officers gave them assurances and instructions not to interfere, the sheriff's officers had increased the risk of suicide upon the unexpected and unsupervised release of the decedent. (*Johnson* v. *County of Los Angeles, supra,* 143 Cal.App.3d at p. 311.) The creation of this unreasonable risk of harm imposed upon them a duty to warn.

Neither appellant nor respondent cites any California decision involving a charge of *criminal* negligence which is helpful to our determination of the nature, if any, of the duty owed here. The cases cited by them in which the defendant was charged with criminal negligence involved relationships which undisputably gave rise to a duty of care. (See, e.g., *Walker* v. *Superior Court* (1988) 47 Cal.3d 112 [253 Cal.Rptr. 1, 763 P.2d 852] [parents who provided only prayer treatment for their seriously ill child]; *People* v.

*Rodriguez* (1960) 186 Cal.App.2d 433 [8 Cal.Rptr. 863] [child killed by a fire after mother left children unattended in home].)

■ We find, however, that the rules governing the imposition of a duty to render aid or assistance as an element of civil negligence, are applicable to the imposition of a duty in the context of criminal negligence. As stated by one leading commentator on criminal law: "[T]he 'measuring stick' [of duty] is the same in a criminal case as in the law of torts. It is the exercise of due care and caution as represented by the conduct of a reasonable person under like circumstances, and this in itself is intended to represent the same requirement whatever the case may be." (Perkins & Boyce, Criminal Law (3d ed. 1982) ch. 7, § 2, p. 843.)

■ We conclude that the evidence of the combination of events which occurred between the time appellant left the bar with Cornejo through the time he fell to the floor unconscious, established as a matter of law a relationship which imposed upon appellant a duty to seek medical aid. At the time appellant left the bar with Cornejo, she observed that he was extremely drunk, and drove him to her home. In so doing, she took him from a public place where others might have taken care to prevent him from injuring himself, to a private place—her home—where she alone could provide such care. To a certain, if limited, extent, therefore, she took charge of a person unable to prevent harm to himself. (Rest.2d Torts, *op. cit. supra,* § 324.) She then allowed Cornejo to use her bathroom, without any objection on her part, to inject himself with narcotics, an act involving the definite potential for fatal consequences. When Cornejo collapsed to the floor, appellant should have known that her conduct had contributed to creating an unreasonable risk of harm for Cornejo—death. At that point, she owed Cornejo a duty to prevent that risk from occurring by summoning aid, even if she had not previously realized that her actions would lead to such risk. (Rest.2d Torts, *op. cit. supra,* § 321.) Her failure to summon any medical assistance whatsoever and to leave him abandoned outside her house warranted the jury finding a breach of that duty.

Appellant next contends that even if the evidence supports the trial court's finding of a duty and breach thereof, there is no substantial evidence which supports a finding of *gross* negligence necessary to impose criminal liability. She points to the testimony of the prosecution's witness, Dr. Daugherty, that even he would not be able to tell, merely from the fact that Cornejo had injected himself with heroin and passed out, that he had overdosed on the drug. She also points to the evidence that Cornejo was snoring after he collapsed and continued to snore after he had been moved outside. She contends such evidence is inconsistent with a finding that her conduct

had the "know[ing] and apparent potentialities for resulting in death." (*People* v. *Rodriguez, supra,* 186 Cal.App.2d at p. 440.)

We disagree. "The fundamental requirement fixing criminal responsibility is knowledge, actual or imputed, that the act of the accused tended to endanger life." (*People* v. *Rodriguez, supra,* 186 Cal.App.2d at p. 440.) Here, the evidence established that appellant knew that Cornejo wanted a spoon to administer drugs, that he then "shot up," i.e., injected himself with drugs, and then collapsed to the floor unconscious. There was also evidence that appellant believed that Cornejo had collapsed because he had "hotshotted," from which the jury could infer that she believed he had injected a dangerous dose, if not a fatal dose, of drugs. Such evidence constitutes substantial evidence that appellant either knew or should have known that Cornejo's condition was critical, that immediate medical aid was necessary, and hat the failure to summon aid tended to endanger Cornejo's life. Such finding is particularly warranted by the evidence that appellant's ex-husband had died of a drug overdose, and that appellant believed that the persons who were with him at the time had delayed too long in seeking medical help.

Substantial evidence also supports a finding that appellant's negligence was a legal cause of Cornejo's death. Dr. Daugherty testified that prompt medical attention, including the use of Narcan, an antidote to morphine which is normally given in cases of morphine overdose, might save a person who collapses from a heroin overdose if that person remains alive for some period after injecting the overdose. Such evidence reasonably supports the inference that appellant's inaction constituted a substantial factor leading to Cornejo's death, and therefore was a proximate cause of his death.

■■■ B. *Aiding and abetting.* Appellant contends there was insufficient evidence to support a finding that she aided and abetted Cornejo's use of heroin.

■■■ A person aids and abets the commission of a crime when he or she, with knowledge of the unlawful purpose of the perpetrator, and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, by act or advice aids, promotes, encourages or instigates the commission of the crime. (*People* v. *Beeman* (1984) 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318]; CALJIC No. 3.01 (1984 revision; see 4th ed. 1987 pocket pt.) Whether a person has aided and abetted the commission of a crime is ordinarily and primarily a question for the trier of fact. (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094 [126 Cal.Rptr. 898].)

■■■ Here, the evidence establishes that appellant was aware of Cornejo's criminal purpose when he asked for a spoon. The evidence of

appellant's act of giving Cornejo a spoon and allowing him to use her bathroom to inject drugs, with the evidence of the flat rubber strap and other drug paraphernalia found by the police at appellant's house, support the finding that appellant facilitated the commission of Cornejo's use of heroin.

The foregoing evidence, and all reasonable inferences drawn therefrom, also support the finding that appellant intended to facilitate Cornejo's use of drugs. ██ The law presumes that an aider and abettor intends the natural and reasonable consequences of the acts he intentionally performs. (*People* v. *Beeman, supra,* 35 Cal.3d at p. 560.)

*People* v. *Hopkins* (1951) 101 Cal.App.2d 704 [226 P.2d 74], though predating *Beeman,* supports our conclusion. There the decedent purchased heroin with the defendant's money. They then prepared the narcotic for injection in the defendant's car and injected themselves, the defendant helping to manipulate a handkerchief-tourniquet around the decedent's arm while he did so. When the decedent fell unconscious, the defendant rushed him to the hospital where he died. The court held there was sufficient evidence to hold the defendant to answer a charge of manslaughter based upon aiding and abetting the decedent's use of heroin. The court further noted: "If [defendant] had not touched decedent's arm or otherwise physically aided him, but had merely stood by and kept a lookout for passers-by he could still be charged as a principal . . . ." (*People* v. *Hopkins, supra,* 101 Cal.App.2d at p. 707; see also *People* v. *Edwards* (1985) 39 Cal.3d 107 [216 Cal.Rptr. 397, 702 P.2d 555].)

We conclude the record supports the trial court's denial of the section 1118.1 motion, and the conviction of involuntary manslaughter on both theories presented to the jury.

## IV

### *Admission of Evidence of Appellant's Statements Concerning Ex-husband's Overdose Did Not Constitute Error*

██ As discussed *ante,* the prosecutor called as a witness Sergeant Jack Harper to testify as to statements made to him by appellant in 1978 concerning the investigation of the death of her ex-husband in 1978. Harper testified that appellant's ex-husband had been with friends, taken drugs, passed out, and then died of an overdose of morphine, amphetamine, and methamphetamine. Although appellant was not present when he died, she "was extremely upset that the people that he was with waited so long before

asking for medical help and that if they had—they done this, he might have been saved."

Defense counsel objected on the grounds of irrelevancy and that the prejudicial effect outweighed the probative value, if any. The trial court admitted the evidence pursuant to Evidence Code section 1250 (statement of declarant's then existing mental or physical state), which provides in part that "evidence of a statement of the declarant's then existing state of mind" is not made inadmissible by the hearsay rule when "[t]he evidence is offered to prove the declarant's state of mind . . . at that time or at any other time when it is itself an issue in the action." The trial court found that such evidence was relevant to show appellant's awareness and knowledge of Cornejo's condition, and that its significant probative value outweighed its prejudicial effect.

Appellant argues that such evidence was irrelevant, or, alternatively, the probative value was outweighed by its prejudicial effect. We can readily dismiss this argument. Proof that appellant knew or should have known that Cornejo's life was in danger after he collapsed was critical to establish criminal negligence; the evidence of her state of mind following her husband's death strongly tended to show that she should have been aware that Cornejo's condition was critical and that medical attention might have saved his life. The evidence was highly relevant and not unfairly prejudicial.

V

*Admission of Physical Evidence of Rubber Strap and Evidence That Cornejo Was Right-handed and Had Aversion to Needles Did Not Constitute Error*

 Appellant contends that the trial court erred in admitting into evidence (1) the flat rubber strap found in her kitchen; (2) the testimony of Cornejo's mother that Cornejo was right-handed (while the autopsy revealed a recent injection on his right arm); and (3) the testimony of Cornejo's sister that he had an aversion to watching his mother inject herself with insulin. Appellant claims that this evidence had little, if any, probative value, and that its admission contravened the trial court's earlier ruling that the prosecutor was precluded from introducing any evidence that appellant had furnished drugs to Cornejo.

We disagree. As to the first contention, the foregoing evidence tended to show that appellant either had injected Cornejo or helped him to inject himself with heroin. We perceive that the act of injecting another person with heroin, accompanied by criminal intent, will constitute in most cases

the aiding and abetting of that person's use of heroin proscribed by Health and Safety Code section 11550 (even though such act may also constitute the administering of heroin proscribed by Health and Safety Code section 11352). Accordingly, such evidence was probative of the elements of aiding and abetting.

As to the second contention, the trial court indeed ruled that the prosecution was barred from attempting to introduce evidence that appellant had sold, furnished, or administered drugs to Cornejo as proscribed by Health and Safety Code section 11352. The trial court specifically allowed, however, for the introduction of evidence tending to show that appellant had assisted Cornejo in injecting heroin, which evidence was relevant to prove aiding and abetting: "[H]elping inject and trying them out is entirely consistent with aiding and abetting . . . which is the People's theory. That is a far cry from furnishing or actually administering. That is where I draw the line."

■■ ■ ■ The trial court's comments reflect an ambiguity concerning the distinction between administering a drug and aiding and abetting another's use of the drug. That ambiguity is discussed in the margin below.[5] ■■ However, because the evidence in question was relevant to prove that appellant had helped inject Cornejo with drugs, which the trial court's ruling explicitly allowed, we find no error in the admission of the evidence.

---

[5]The trial court admonished the prosecutor that he should not attempt to introduce evidence of administration proscribed by Health and Safety Code section 11352: ". . . I come back again, Counsel, to your theory expressed in the Information under 11550 of use or being under the influence, whatever reasons as a decision made to charge it that way. I'm not going to permit by the back door, evidence of administration under a theory that it's the functional equivalent of aiding and abetting [an] 11550."

The term "administer" used in Health and Safety Code section 11352 encompasses the act of giving another person an intravenous injection, and does not refer to the self-administration of drugs. (*People* v. *Label* (1974) 43 Cal.App.3d 766, 769-771 [119 Cal.Rptr. 522].) Accordingly, one's use of a controlled substance proscribed by Health and Safety Code section 11550 does not constitute the administration of a controlled substance proscribed by Health and Safety Code section 11352. For that same reason, the offense of aiding and abetting another's use of a controlled substance, a misdemeanor, is not the same offense as administering a controlled substance, a felony.

However, aiding and abetting another's use of a controlled substance proscribed by Health and Safety Code section 11550 may also constitute administering a controlled substance proscribed by Health and Safety Code section 11352, even though the latter offense is not charged.

## VI

### *There Was No Prosecutorial Misconduct*

■ The record shows the prosecutor directly and unambiguously argued to the jury in closing arguments that the evidence supported a finding that appellant had injected Cornejo with heroin. At the conclusion of the prosecutor's closing argument, defense counsel moved for a mistrial on the ground of prosecutorial misconduct. He contended the prosecutor had improperly argued to the jury that the evidence showed that appellant had administered heroin to Cornejo. The trial court denied the motion, stating that the evidence to which the prosecutor had referred had been admitted without any limitations as to its purpose.

Appellant now argues: "Because the record shows unequivocally that the trial court repeatedly told the district attorney he could not try this case on an 'administering' theory, and that the evidence on which he relied to raise the inference that appellant had administered heroin to Cornejo *was* admitted on the condition that it not be used for that purpose, the trial court erred and appellant's motion should have been granted."

Regardless of any limitations imposed by the trial court on the use of the evidence in question, the prosecutor's argument to the jury that appellant had injected or helped to inject Cornejo did not violate the trial court's previous ruling that he could not present the case to the jury on an administering theory. (See discussion *ante,* in section V.) The denial of the motion for new trial did not constitute an abuse of the trial court's discretion.

## VII

### *Disposition*

The judgment is affirmed.

White, P. J., and Barry-Deal, J., concurred.

A petition for a rehearing was denied June 5, 1989, and appellant's petition for review by the Supreme Court was denied August 17, 1989.