756 So.2d 68 (2000)
Theresa SIENIARECKI, Petitioner,
v.
STATE of Florida, Respondent.
No. SC94800.
Supreme Court of Florida.
April 27, 2000.
*70 Richard L. Jorandby, Public Defender, and Joseph R. Chloupek, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, Florida, for Petitioner.
Robert A. Butterworth, Attorney General, Celia Terenzio, Bureau Chief, and Ettie Feistmann, Assistant Attorney General, West Palm Beach, Florida, for Respondent.
LEWIS, J.
We have for review a challenge to the constitutionality of section 825.102(3), Florida Statutes (1997), which, in pertinent part, penalizes "[a] caregiver's [culpably negligent] failure or omission to provide [a] ... disabled adult with the care, supervision, and services necessary to maintain the ... disabled adult's physical and mental health, including, but not limited to, food, nutrition, clothing, shelter, supervision, medicine, and medical services that a prudent person would consider essential for the well-being of the ... disabled adult." The Fourth District Court of Appeal, in Sieniarecki v. State, 724 So.2d 626 (Fla. 4th DCA 1998), expressly declared the applicable provisions of chapter 825, Florida Statutes, to be valid. We have jurisdiction. See art. V, § 3(b)(3), Fla. Const. For the following reasons, we uphold the statutory provisions involved, and approve the decision of the district court.

MATERIAL FACTS AND PROCEEDINGS BELOW
In this case, the evidence at trial demonstrated that petitioner, Theresa Sieniarecki, was the oldest of decedent's four children. Until approximately two weeks before her death, the petitioner's mother, Patricia Sieniarecki, lived with petitioner, petitioner's boyfriend, and two of petitioner's brothers in the family home. Mrs. Sieniarecki's husband (petitioner's father) died from lung cancer shortly after Mrs. Sieniarecki had undergone two hip surgeries, and while she was recovering in a rehabilitation facility.
Following her second hip surgery and her husband's death, the mother's disposition changed dramatically. She appeared to be despondent and disoriented. She would ask her younger son where her dead husband was, calling that son by his older brother's name. It appeared that she had "given up," and that she "wouldn't do anything." Although apparently physically able to walk, she now would not walk at all. The children never left their mother alone at home, because she sometimes needed help or food. Always a picky eater, she ate and drank so little that, at the time of her death, even though she was five feet, three inches tall, she weighed only sixty-eight pounds.
It was also during this time that the family home was subjected to foreclosure. The children helped their mother with the sale of the home, and, with the little money left over after paying off the mortgage debt, the family moved into two separate apartments. Before moving, the children discussed with whom Mrs. Sieniarecki was to live. The record reflects that it was decided that the mother would live with petitionerwho had completed the tenth grade, but did not workbecause petitioner "was able to take care of her," whereas, the two brothers (one of whom was at work "a lot," while the other worked and attended school) would not have had "that much time to spend with her." The two brothers moved into an efficiency apartment. Petitioner, her boyfriend, and her mother moved into a two-bedroom apartment.
The apartment manager testified that, at the time petitioner and her boyfriend were making arrangements to move into the apartment, the manager asked whether Mrs. Sieniarecki, who "looked like she was very weak," would be able to reach an upstairs apartment. Petitioner's boyfriend indicated to him that Mrs. Sieniarecki would be carried up when the three of them moved in, and "would not ever be coming back down the stairs anymore." *71 In fact, when the three of them did move in, petitioner's boyfriend carried Mrs. Sieniarecki up to the apartment, because she was "tired."
Since Mrs. Sieniarecki would not walk (even to the bathroom), she required adult diapers. Petitioner testified that she bathed her mother and changed her diapers. She testified that she had no help from others with these tasks. Although she brought her mother food and liquids, if she tried to persuade her mother to eat, Mrs. Sieniarecki would "take a bite and then she'd throw it," or she would just "leave it there to sit all night." While, on one hand, petitioner testified that she spent time with her mother, and, except when her brother came to visit "every once in a while," all the responsibility fell on her, she also stated that she did not know whether her mother ate what she brought her or not. She stated that she was her mother's sole provider, except when her brother brought chili dogs for her mother to eat.
The mother's previous mattresswhich was filthywas kept in a utility room by the front door of the apartment. The new mattress on the mother's bed was not covered with a bottom sheet, because the old sheets got "messed up," and petitioner "threw them out with the old mattress." Petitioner testified that her mother would get feces on her hands from the adult diapers, and then scratch her legs and face, and touch the wall. Petitioner testified that she cleaned up after her mother, but never noticed any diaper rash on her. She also stated that she never called anyone to obtain help, advice or medical care for her mother.
Mrs. Sieniarecki's children testified that, whenever it was suggested to their mother that she go to a doctor, the mother would yell, indicating her disagreement. Petitioner also testified that, if she suggested to her mother that she not smoke cigarettes, her mother would yell at her to bring cigarettes.
According to petitioner's testimony, at about 10 p.m. on the night before her mother died, petitioner put a new diaper on her, "because she was gross." At about midnight, her mother "bitched at me, she wanted water. She just yelled, Theresa, bring me some water." The next morning, at mid-morning, when petitioner went in to see her mother, she was dead. Police were called at about 11:50 a.m. that morning.
The detective who came to the scene found Mrs. Sieniarecki lying on the bare mattress with one sheet covering her. She was wearing nothing but a polo shirt, with one tennis shoe on her right foot. Her hair was disheveled and her body was smeared with feces. The mattress on which she was lying was filthy, soiled with urine and feces. He found feces smeared on the wall next to the bed.
Dr. Price, the physician who performed the autopsy (stipulated to be an expert in forensic pathology) testified regarding Mrs. Sieniarecki's condition and the cause of her death. Dr. Price indicated that she had no teeth, and that he found nothing other than bile in her stomach or digestive tract. Her eyes were deeply sunken in, indicative of severe dehydration. Her right foot was ulcerated in the heel area "clear down to the bone," and this decubitus ulcer was "covered by green pus." Her skin was reddened with external sores in the thigh and buttocks area, indicating antemortem irritation from feces or urine being left on her skin. Although in her fifties, Mrs. Sieniarecki appeared to be much older.
The cause of Mrs. Sieniarecki's death was, in Dr. Price's opinion, septicemia (an infection in her blood), occurring as a result of decubitus ulcers, a bladder infection and a vaginal infection. Dehydration and malnutrition contributed to the cause of death. Specifically, Dr. Price testified that Mrs. Sieniarecki's bladder was black, green and necrotic (indicating dead tissue), "almost falling apart if you handled it too harshly." The bladder had, in this case, *72 folded over and caused a hole, or fistula, to develop between the vagina and the bladder itself. The vagina, too, was necrotic. The dead tissue in both organs "pretty much went through the full thickness of the wall where the vessels were" in Mrs. Sieniarecki's body. The infection not only involved her bladder and vagina, but had spread into her fat and abdominal cavity as well.

PROCEEDINGS BELOW
After a jury trial, petitioner was found guilty of neglect of a disabled adult, pursuant to section 825.102(3), Florida Statutes (1997). That section provides in pertinent part:
(3)(a) "Neglect of an elderly person or disabled adult" means:
1. A caregiver's failure or omission to provide an elderly person or disabled adult with the care, supervision, and services necessary to maintain the elderly person's or disabled adult's physical and mental health, including, but not limited to, food, nutrition, clothing, shelter, supervision, medicine, and medical services that a prudent person would consider essential for the well-being of the elderly person or disabled adult; or
2. A caregiver's failure to make a reasonable effort to protect an elderly person or disabled adult from abuse, neglect, or exploitation by another person.
Neglect of an elderly person or disabled adult may be based on repeated conduct or on a single incident or omission that results in, or could reasonably be expected to result in, serious physical or psychological injury, or a substantial risk of death, to an elderly person or disabled adult.
. . . .
c) A person who willfully or by culpable negligence neglects an elderly person or disabled adult without causing great bodily harm, permanent disability, or permanent disfigurement to the elderly person or disabled adult commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
"Caregiver" is defined in the statute as "a person who has been entrusted with or has assumed responsibility for the care or the property of an elderly person or [a] disabled adult. `Caregiver' includes, but is not limited to, relatives, court-appointed or voluntary guardians, adult household members, neighbors, health care providers, and employee and volunteers of facilities as defined in subsection (7)." § 825.101(2), Fla. Stat. (1997) (emphasis supplied). "Disabled adult" is defined as "a person 18 years of age or older who suffers from a condition of physical or mental incapacitation due to a developmental disability, organic brain damage, or mental illness, or who has one or more physical or mental limitations that restrict the person's ability to perform the normal activities of daily living." § 825.101(4), Fla. Stat.(1997) (emphasis supplied).

LAW AND ANALYSIS
On appeal, the Fourth District upheld petitioner's conviction in the face of a three-tiered constitutional challenge. First, petitioner asserted that the applicable provisions are "facially unconstitutional because they do not contain a specific intent requirement and thereby violate due process by imposing an affirmative duty upon [petitioner] to act, while penalizing [petitioner's] failure to comply." Next, she maintained that the provisions "are unconstitutionally vague." Finally, she urged that section 782.07(2), Florida Statutes (1997), "violates her mother's right to privacy embodied in Article I, section 23 of the Florida Constitution."[1] Specifically, on this last issue, petitioner argued that her mother had the right to refuse medical *73 treatment, and as a result, petitioner could not be convicted of neglect for failure to provide proper medical attention. Consistent with the Fourth District's decision, we find that petitioner's arguments fail to overcome the presumption of constitutionality which applies. See Cilento v. State, 377 So.2d 663, 665 (Fla.1979).

DUE PROCESS
Petitioner's first claim is that the neglect provisions of the statute violate due process because they fail to contain a specific intent requirement. Although couched here in different terms (i.e., as a "due process" challenge, rather than an argument based on vagueness, over-breadth or indefiniteness), this assertion that the statute potentially criminalizes innocent conduct[2] has, in a slightly different context, been addressed before.
Twice, the constitutionality of certain Florida child protection statutes based upon negligence has been questioned before this Court. The first of these statutes, section 827.05, Florida Statutes (1975), which prohibited the "negligent treatment of children," was found to be unconstitutional. See State v. Winters, 346 So.2d 991 (Fla.1977) (declaring former section 827.05, Florida Statutes (1975) to be unconstitutionally vague, indefinite and overbroad, on the basis that it criminalized simple negligent conduct which was neither willful nor culpably negligent); accord State v. Mincey, 672 So.2d 524 (Fla.1996) (involving invalidation for vagueness of amended section 827.05, Florida Statutes *74 (1991), where the amended provision continued to criminalize simple negligent conduct).
However, the second such statute, which proscribed "simple criminal child abuse" (defined, inter alia, as depriving a child of necessary food, clothing, shelter or medical treatment, either willfully or by culpable negligence) was upheld against a similar challenge. See State v. Joyce, 361 So.2d 406, 407 (Fla.1978)(upholding, in the face of a vagueness challenge, former section 827.04(2), Florida Statutes (1975), which prohibited the willful or culpably negligent deprivation of a child's necessary food, clothing, shelter or medical treatment). In Joyce, this Court rejected an argument, based upon Winters, that the simple criminal child abuse statute was unconstitutional, reasoning:
Appellees contend that the county courts' invalidation of Section 827.04(2), Florida Statutes (1975), is consistent with our decision in State v. Winters, 346 So.2d 991 (Fla.1977). There, Section 827.05, Florida Statutes (1975), which criminalized "negligent treatment of children," was declared unconstitutionally vague, indefinite and overbroad. Our decision in Winters, however, does not support the determination of the county courts that Section 827.04(2), the child abuse statute, is unconstitutional. The basis for our holding there was that the negligent treatment statute made criminal acts of simple negligenceconduct which was neither willful nor culpably negligent. Section 827.04(2), in contrast, requires willfulness (scienter) or culpable negligence. The Winters Court was careful to distinguish Section 827.04(2) on this basis. As we recently concluded in upholding Section 784.05, Florida Statutes (1975), the culpable negligence statute, the term "culpable negligence" does not suffer from the constitutional infirmity of vagueness. See State v. Greene, 348 So.2d 3 (Fla. 1977).... The requirement of willfulness (scienter) or culpable negligence in Section 827.04(2), therefore, avoids the infirmity found in Winters with respect to Section 827.05 that unintentional acts or conduct which is not the product of culpable negligence might be proscribed by the statute.
361 So.2d at 406 (footnote omitted) (emphasis supplied).
Here, similarly, the challenged provisions proscribe neglect which is caused either wilfully or by culpable negligence. Because the term "culpable negligence" is not constitutionally infirm, petitioner's challenge on this basis fails. See State v. Greene, 348 So.2d 3 (Fla.1977).

VAGUENESS
As we explained in Brown v. State, 629 So.2d 841, 842-43 (Fla.1994):
The standard for testing vagueness under Florida law is whether the statute gives a person of ordinary intelligence fair notice of what constitutes forbidden conduct. Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). "The language of the statute must `provide a definite warning of what conduct' is required or prohibited, `measured by common understanding and practice.'" Warren v. State, 572 So.2d 1376, 1377 (Fla.1991) (quoting State v. Bussey, 463 So.2d 1141, 1144 (Fla.1985)).
Further, the traditional rule is that "a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." New York v. Ferber, 458 U.S. 747, 767, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (citing Broadrick v. Oklahoma, 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). "If the record demonstrates that the [petitioner] engaged in some conduct clearly proscribed by the plain and ordinary meaning of the statute, then [s]he cannot successfully challenge it for vagueness nor complain of its vagueness as applied to the hypothetical conduct of others." State v. *75 Barnes, 686 So.2d 633, 637 (Fla. 2d DCA 1996), review denied, 695 So.2d 698 (Fla.), and cert. denied, 522 U.S. 903, 118 S.Ct. 257, 139 L.Ed.2d 184 (1997). Thus, in undertaking a vagueness analysis, this Court should "examine the complainant's conduct before analyzing other hypothetical applications of the law." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).
Here, petitioner claims that it is not clear, within the meaning of the statute, that her mother had "one or more physical or mental limitations that restrict the person's ability to perform the normal activities of daily living," or that petitioner "assumed" responsibility to provide "care, supervision, and services necessary to maintain" her mother's "physical and mental health, including, but not limited to, food, nutrition, clothing, shelter, supervision, medicine, and medical services that a prudent person would consider essential for [her] well-being." As to petitioner's first point, it was undisputed that Mrs. Sieniarecki's behavior after her husband's death was disoriented, and that she "wouldn't do anything." While petitioner questions the degree to which a person's normal functions must be impaired in order to qualify as a "disabled person,"when "measured by common understanding and practice," the de facto total impairment which her mother exhibited clearly falls within the statute's definition.
Next, petitioner questions whether she "assumed" responsibility to provide care, supervision and necessary services to her mother. In the absence of a statutory definition, words of common usage are construed in their plain and ordinary sense. See State v. Hagan, 387 So.2d 943 (Fla.1980). "If necessary, the plain and ordinary meaning of the word can be ascertained by reference to a dictionary." Green v. State, 604 So.2d 471, 473 (Fla.1992). In the dictionary, the pertinent definition of the infinitive "to assume" is "to take to or upon oneself." Webster's Third New International Dictionary 133 (1993). Here, petitioner's own testimony reflected that she "took upon herself" the responsibility to care and provide for her mother. Petitioner, who was not otherwise employed, testified that she bathed her mother and changed her diapers (and no one else helped her with these tasks); that she brought her mother food and liquids; that all the responsibility fell on her; and thatexcept when her brother brought chili dogs for her mother to eat she was her mother's sole provider. The evidence established that a joint decision was made as to where petitioner's mother would reside after sale of the family home and who would provide the day to day care. Petitioner also testified that she never called anyone to obtain help, advice or medical care for her mother.
Thus, it is clear, on the facts of this case, that the petitioner "assumed responsibility" for the care of her mother, a "disabled adult" within the plain meaning of the statute. Petitioner's resulting conduct in failing to adequately address her mother's most basic needseither by providing for them herself or by seeking the assistance of otherssquarely fell within the statute's proscriptions.
Therefore, not only is the statute not unconstitutional as applied, but petitioner also lacks standing to raise a facial vagueness challenge. Cf. Village of Hoffman, 455 U.S. at 495, 102 S.Ct. 1186 (observing that "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others"); Parker v. Levy, 417 U.S. 733, 756, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (recognizing that "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness"); see also State v. Muller, 693 So.2d 976 (Fla.1997) (holding that section 316.193(6)(d), Florida Statutes (1993), which requires impoundment or immobilization of a vehicle driven by a person convicted of DUI, unless the court finds that the family of the owner has no *76 other means of transportation, is not unconstitutionally vague, and rejecting car owner's contention that the statute violates the due-process rights of nondefendant owners, on the ground that "Muller lacks standing to raise this claim, as he owned the vehicle used in the crime"). However, because the statute clearly applies in petitioner's case, it is not unconstitutionally vague in all its applications; therefore, the statute is not unconstitutional on its face. Cf. Jean v. State, 24 Fla. L. Weekly D1392, ___ So.2d ___, 1999 WL 393477 (Fla. 4th DCA June 16, 1999)(holding that section 893.13(1), Florida Statutes (1997), was not "impermissibly vague in all of its applications" where the record reflected that Jean's "conduct clearly fell within the statutory prohibition;" therefore, the statute was facially constitutional); Wilburn v. State, 23 Fla. L. Weekly D1544, ___ So.2d ___, 1998 WL 329475 (Fla. 4th DCA June 24, 1998)(holding that, where statute provides adequate notice that the appellant's conduct is unlawful, the statute is not unconstitutionally vague on its face because it is not vague in all of its applications), review denied, 719 So.2d 894 (Fla.1998).

MRS. SIENIARECKI'S PRIVACY RIGHT
Appellant's last claim is that section 825.102(3) violates her mother's right to privacy. See art. I, § 23, Fla. Const. Specifically, she asserts that, because her mother had the right to refuse medical treatment, petitioner cannot be convicted of neglect for failing to provide proper medical attention. However, as the Fourth District observed in its decision below, constitutional rights are personal in nature and generally may not be asserted vicariously.[3]See Broadrick v. Oklahoma, 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)(recognizing that "constitutional rights are personal and may not be asserted vicariously"); Sandstrom v. Leader, 370 So.2d 3, 4 (Fla.1979)(observing that "[f]undamental constitutional principles dictate that one may not challenge those portions of an enactment which do not adversely affect his personal or property rights"). For this reason, petitioner's final challenge also fails.
For the foregoing reasons, the decision below is approved.
It is so ordered.
HARDING, C.J., and SHAW, WELLS, PARIENTE and QUINCE, JJ., concur.
ANSTEAD, J., concurs in result only.
NOTES
[1] Here, petitioner does not challenge section 782.07(2), but applies this same argument to section 825.102(3).
[2] Petitioner asserts that section 825.102(3) creates an affirmative duty "to provide care, supervision, or services to another person" not recognized at common law. In this case, petitionerwho assumed responsibility for the day-to-day care of her disabled mother was in a unique position to assist her mother and to make other potential sources of assistance aware of her mother's needs. Cf. Personal Representative of Estate of Starling v. Fisherman's Pier, Inc., 401 So.2d 1136, 1137-38 (Fla. 4th DCA), review denied, 411 So.2d 381 (Fla.1981)( holding that a proprietor may have a duty to "take some minimal steps to safeguard" an invitee upon his premises from extreme danger, even where the invitee, through his own negligence, illness, injury or drunkenness "has allowed himself to be exposed to that danger in the first place"); People v. Oliver, 210 Cal.App.3d 138, 258 Cal. Rptr. 138, 144 (1989) (recognizingin affirming Oliver's conviction for involuntary manslaughter based upon her failure to seek medical aid for the victim, a man she had met at a bar and brought to her home, who died of a heroin overdosea duty to act arising from a special relationship [derived in part from Restatement (Second) of Torts § 324 (1965), providing that "[o]ne who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by ... the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge"] created when Oliver took the victim "from a public place where others might have taken care to prevent him from injuring himself, to a private placeher homewhere she alone could provide such care"). But cf. Neveils v. State, 145 So.2d 883, 884 (Fla. 1st DCA 1962) (holding that Neveils, who failed to "aid or otherwise be concerned with the safety of his wife" during the intervening period between the time when he first discovered her lying on the floor and four hours later, when he called an ambulance, was not guilty of manslaughter based upon culpable negligence). Regardless of whether the subject legislation created a new duty, or codified an existing common law duty, with respect to the acts and omissions of an adult child who assumes the day-to-day care of a disabled parent living in the same household, it is clear that the Legislature now intends to provide liability for such caretaker's culpable negligence resulting in neglect of the disabled adult. Cf. Eversley v. State, 748 So.2d 963 (Fla.1999) (observing that, "by making a specific reference to the child abuse statute, it is clear that the Legislature now intends to include the failure to provide medical care within the definition of manslaughter," and had the amended statutes "been in effect at the time of the alleged crime in this case, Eversley's conduct [in failing to obtain needed medical care for her infant son] would have been punishable as manslaughter," but holding that, because the alleged crime took place prior to the effective date of the amendments, the finding in Bradley v. State, 79 Fla. 651, 84 So. 677 (1920), that a parent's failure to provide needed medical care for his child does not rise to the level of culpable negligence required for the manslaughter statute "controls, and the trial court was correct in granting the motion for judgment of acquittal as to the manslaughter charge").
[3] A recognized exception to this rule applies where enforcement of a challenged restriction would adversely affect the rights of non-parties, and there is no effective avenue for them to preserve their rights themselves. Cf. Stall v. State, 570 So.2d 257, 258 (Fla.1990)("[a]ssuming that the petitioners [who were alleged vendors of obscene materials] have vicarious standing to raise their customers' privacy interest"). This principle has been extended to apply where it is the petitioners who "stand to lose from the outcome of this case and yet they have no other effective avenue for preserving their rights" than by raising the constitutional rights of non-parties. Jones v. State, 640 So.2d 1084, 1085 (Fla.1994)(recognizing petitioners' vicarious standing to assert the claimed privacy rights of the underaged girls with whom they had sexual intercourse). Neither of these exceptions applies here.