LEWIS, J. This case involves a Florida constitutional challenge to the 2013 amendments to sections 766.106 and 766.1065 of the Florida Statutes. Generally,-the statutes pertain to invasive presuit notice requirements that must be satisfied before a medical-negligence action may be filed, as well as an informal discovery process that accompanies that presuit notice process, and the amendments- at issue here authorize, secret, ex.parte interviews as part of the informal discovery process. The First District Court of Appeal upheld the constitutionality of these statutory amendments in Weaver v. Myers, 170 So.3d 873, 883 (Fla. 1st DCA 2015). Weaver then petitioned this Court for review.[1] Because the district court expressly declared a state statute valid, this Court,has discretionary jurisdiction to review the decision. See art. V, § 3(b)(3), Fla. Const. We accept that jurisdiction. STATUTORY BACKGROUND Since 2011, before filing a medical negligence action in Florida, ,a claimant must satisfy statutory requirements, which include conducting a presuit investigation process to ascertain whether there are reasonable grounds -to believe that the defendant medical provider was negligent, and that the negligence resulted in injury to the claimant. § 766,203(2)(a)-(b), Fla. Stat. (2016). Following that investigation, a claimant must give each prospective defendant pre-suit notice of intent to initiate litigation and make certain disclosures. § 766.106(2)(a), Fla. Stat. (2016). The notice must disclose, where available, a list of all health care providers seen by the claimant for the injuries complained of and all known health care providers seen during the two-year period prior to the alleged act of negligence. Id. Furthermore, a medical malpractice claimant must furnish all medical records that the presuit investigation expert relied upon in signing an affidavit indicating a good-faith basis to believe a valid claim exists. See id. In .addition, the presuit notice must include an executed authorization form that is provided in section 7661065 of the Florida Statutes. Id. That executed authorization form is titled “Authorization for Release of Protected Health Information.” § 766.1065, Fla. Stat. (2016). By executing the authorization form in compliance with the statutory presuit notice requirement, the claimant is required to authorize the release of protected verbal and written health- information that is potentially relevant to the claim of medical negligence in the- possession óf the' health care providers listed in the notice disclosures. § 766.1065(3)B.1.-2., Fla. Stat. However, this authorization is not a blanket authorization—it excludes health care providers who do not possess information that is potentially relevant to the ' claim. § 766.1065(3)0. Nevertheless, the claimant is required'to name these providers and provide the dates of treatments rendered by others. Id. As part of this presuit machinery unique to medical malpractice claims, “the parties shall make discoverable information available without , formal discovery.” § 766.106(6)(a), Fla. Stat. Under this.informal discovery, ⅞ a prospective defendant may require a medical malpractice claimant seeking redress to: (1) give an, un-sworn statement; (2) produce requested documents, things, and medical records; (3) submit to a physical or mental examination; (4) answer written questions; and (5) authorize treating health care providers to give unsworn statements. See § 766.106(6)(b), Fla. Stat. The statutory scheme further provides, however, that “work product generated by the presuit screening process is not discoverable or admissible in any civil action for any purpose by the opposing party.” § 766.106(5), Fla. Stat. But, failure to participate in informal discovery “is grounds for dismissal of claims or defenses ultimately assert^ ed.” § 766.106(6)(a), Fla. Stat. AMENDMENTS AT ISSUE While it retained the scheme described above, in 2013, the Legislature added secret, ex parte interviews to the list of informal discovery devices to which a medical malpractice claimant seeking redress must consent: Interviews of treating health-care providers.—A prospective defendant or his or her legal representative may interview the claimant’s treating health care providers consistent with the authorization for release of protected health information. This subparagraph does not require a claimant’s treating health care provider to submit to a request for an interview. Notice of the intent to conduct an interview shall be provided to the claimant or the claimant’s legal representative, who shall be responsible for arranging a mutually convenient date, time, and location for the interview within 15 days after the request is made. For subsequent interviews, the prospective defendant or his or her representative shall notify the claimant and his or her legal representative at least ■ 72 hours before the subsequent interview. If the •claimant’s attorney fails to schedule an interview, the prospective, defendant or his or her legal representative may attempt to conduct an interview without further notice to the claimant or the claimant’s legal representative. § 766.106(6)(b)5., Fla. Stat. (emphasis added); Ch. 2013-108, §=3, at 5, Laws of Fla. Thus, that plain language requires that', upon request by the prospective defendant, the medical malpractice claimant' must arrange for an interview between his or her treating health care providers and the prospective defendant or legal representatives of such defendant within fifteen days of the request. Without providing any limitation on the number of interviews, the plain language further provides for arranging subsequent interviews with 72-hours’ notice. However, if at any time the medical malpractice claimant’s attorney fails to schedule a requested interview, then the prospective defendant or his lawyers may unilaterally and without notice schedule the claimant’s treating health care providers for such an interview without any notice to the claimant whatsoever. Nothing prevents multiple attempts at securing such interviews. Further, the statutorily mandated authorization form was also amended and makes clear that the prospective defendant may interview the claimant’s treating health care providers ex parte in secret, without the claimant or the claimant’s attorney present: This authorization expressly allows the persons or class of persons listed in subsections D.2.-4. above to interview ■ the health care providers listed in subsections B.1.-2. above, without the presence of the Patient or the Patient’s attorney. § 766.1065(3)E., Fla. Stat. (emphasis added); Ch. 2013-108, § 4, at 7, Laws of- Fla. However, because “[t]his authorization expressly allows the persons or class of persons listed in subsections D.2.-4. above to interview,” the authorization requires a medical malpractice claimant to expose health care providers to such clandestine, ex parte interviews not only with the prospective defendant, but also with a broad set of parties, including related insurers, expert witnesses, attorneys, and support staff: 2. Any liability insurer or self-insurer providing liability insurance coverage, self-insurance, or defense to any health care provider, to whom presuit notice is given, or to any health care provider listed in subsections B.1.-2. above, regarding the care and treatment of the Patient. 3. Any consulting or testifying expert employed by or on béhalf of (name of health care provider to whom presuit notice was given) arid his/her/its insurer(s), self-insurer(s), or attorney(s) regarding the matter of the presuit notice accompanying this authorization. 4. Any attorney (including his/her staff) erhployed by or on behalf of (name of health care provider to whom presuit notice was given) or employed by or on behalf of any health care provider(s) listed in subsections B.1.-2. above, regarding the matter of the presuit notice accompanying this authorization dr the care and treatment of the Patient. § 766.1065(3)D.2.-4., Fla. Stat. The Legislature did not amend the statute without some expression of its intent. Specifically, in 2013, the Legislature added a third express purpose for the release of the protected health information: “Obtaining legal advice or representation arising out of the medical negligence claim described in the accompanying presuit notice.” § 766.1065(3)A.3., Fla. -Stat.; Ch. 2013-108, § 4", at 6, Laws of Fla. Before the amendments, the stated purpose of the mandatory authorization was twofold—to facilitate the investigation and evaluation of the claim, or to defend against any litigation arising out of the claim. § 766.1065(3)A.l.-2., Fla. Stat. (2012); Ch. 2013-108, § 4, at 6, Laws of Fla. Further, as was true before the 2013 amendments, it remains true today that these conditions imposed by the . Legislature are nonnegotiable. Specifically, “If the authorization required by this section is revoked, the presuit notice under s. 766.106(2) is deemed retroactively void from the date of issuance, and any tolling effect that the.presuit notice may have had on any applicable statute-of-limitations period is retroactively rendered void.” § 766.1065(2), Fla. Stat. (2016); see also generally § 95.11(4)(b), Fla. Stat. (20,16) (“An action for medical malpractice shall be commenced within 2 years from the time the incident giving rise to the action occurred or within 2 years from the time the incident is discovered, or should have been discovered with the exercise of due diligence .... ”). Thus, as the decision below correctly recognized, a claimant now cannot institute a medical malpractice action without authorizing ex parte interviews between the claimant’s health care providers and the potential defendant, Weaver, 170 So.3d at 877. FACTUAL AND PROCEDURAL BACKGROUND Faced with the expanded disclosure requirements, Petitioner Emma Gayle Weaver (Weaver), individually and as personal representative of the estate of her late husband Thomas Weaver (Thomas), filed an action against Respondent Dr. Stephen C. Myers for declaratory judgment and injunctive relief with regard- to the 2013 amendments on the date they became effective. Weaver contended that Dr. Myers provided care to Thomas that allegedly led to his injury and death. Relevant here, Weaver contended that the 2013 amendments violated the right of access to courts and the right to privacy under the Florida Constitution. With regard to the right to privacy claim, the trial court granted in part Dr. Myers’ motion to dismiss and dismissed Weaver’s privacy claim. The trial court firát concluded that an estate cannot assert ány privacy rights on behalf of a decedent because such rights under the Florida Constitution absolutely terminate upon death and essentially are retroactively destroyed. The court then held that even if Weaver could assert Thomas’ privacy rights, the claim should still be dismissed because a constitutional privacy challenge can only be asserted to protect against a government entity or actor even though it is obvious that a state statute is authorizing the invasion here. With regard to the access to courts challenge, on June 24, 2014, the trial court granted Dr. Myers’ motion for summary judgment. The trial court reasoned that the predecessor statute to section 766.106 was held to be valid under the applicable provision of the "Florida Constitution. See Lindberg v. Hosp. Corp. of Am., 545 So.2d 1384, 1386 (Fla. 4th DCA 1989), approved 571 So.2d 446 (Fla. 1990). The court then concluded the addition • of the secret éx parte interviews do not represent a material change sufficient to render the statute an impermissible burden on access to courts. On appeal, the First. District .affirmed, Weaver, 170 So.3d at 883. With regard to access to courts, the. First District stated that “[a] statute which merely imposes a condition precedent to suit without abolishing or eliminating a substantive right must be upheld in the face of a constitutional challenge unless the statute ‘create[s] a significantly difficult impediment to ... right of access.’” Id. at 882 (quoting Henderson v. Crosby, 883 So.2d 847, 854 (Fla. 1st DCA 2004) (quoting Mitchell v. Moore, 786 So.2d 521 (Fla. 2001))). The district court determined that the signing and serving of the mandatory authorization as part of the presuit process does not “abolish or eliminate” any substantive right, and concluded that “all- that is imposed is a precondition to suit, in addition to those that are already in existence under chapter 766.” Id. It then stated: Though [Weaver] is correct that the amendments to the authorization for release of protected health information now require the claimant to expressly authorize ex parte interviews between former health care practitioners with information relevant to the potential lawsuit and the potential defendant, we find that like the presuit notice requirement itself, this ip a reasonable condition precedent to filing suit, and, thus, does not violate her right to access the courts. Id. at 882-83. With regard to the privacy challenge, the district court, unlike the trial court, addressed this claim on the merits and concluded that “any privacy rights that might attach to a claimant’s medical information are waived once that information is placed at issue by filing a medical malpractice claim. Thus, by filing the medical, malpractice lawsuit, the decedent’s medical condition is at issue.” Id. at 883 (citations omitted). The district court further noted that prior to the 2013 amendments, potential- claimants were already required to disclose and produce relevant medical records to the defense during the presuit process. Id, The court below did not acknowledge or even address the concept of non-relevant matters and privacy rights related thereto. Therefore, the district court upheld the constitutionality of the statutes. This review follows. ANALYSIS Weaver contends that the Legislature’s passage of certain amendments to sections 766.106 and 766.1065 of the Florida Statutes are unconstitutional for several reasons. First, Weaver contends that the amendments violate the right to privacy explicitly provided for in the Florida Constitution. Relatedly, Weaver also contends that placing a prerequisite condition on her action for wrongful death requiring the release of Thomas’ medical records and the facilitation of ex parte, secret presuit interviews with Thomas’ medical providers violates the right to access to courts. Because these issues are questions of Florida constitutional law, our review is de novo. Caribbean Conservation Corp. v. Fla. Fish & Wildlife Conservation Comm’n, 838 So.2d 492, 500 (Fla. 2003). The United States Supreme Court has explained that the United States Constitution does not mention the right to privacy, but that it is a pervasive right touching on many aspects of life and the right of privacy finds its roots throughout the Bill of Rights and in the.Fourteenth Amendment: The Constitution does not explicitly mention any right of privacy. In a line of decisions, however, going back perhaps as far as Union Pacific R. Co. v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891), the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution. In varying contexts, the Court or individual Justices have, indeed, found at least the roots of that right in the First Amendment; in the Fourth and Fifth Amendments; in the penumbras of the Bill of Rights; in the Ninth Amendment; or in the concept of liberty guaranteed by the first .section of the Fourteenth Amendment. These decisions make it clear that only personal rights that can be deemed “fundamental” or “implicit in the concept of ordered liberty,” are included in this guarantee of personal privacy. They also make it clear that the right has some extension to activities relating to. marriage; procreation; contraception; family relationships; .and child rearing and education. Roe v. Wade, 410 U.S. 113, 152-53, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), holding modified by Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (internal citations omitted). While the federal right to privacy is pervasive and is revealed by judicial interpretation, we need not rely on federal law but look only to the Florida Constitution, which explicitly provides a right to privacy: Every natural person has the right to be let alone and free from governmental intrusion into the person’s private life except as otherwise provided herein. Art. I, § 23, Fla. Const. (1980). This provision was added by Florida voters in 1980 and remains unchanged. We have explained that the right to privacy in, the Florida Constitution is broader, more fundamental, and more highly guarded than any federal counterpart: This amendment is an independent, freestanding constitutional provision which declares the. fundamental right ,to privacy. Article I, section 23, was-intentionally phrased in strong terms. The drafters of the amendment rejected, the use of the words “unreasonable.” or “unwarranted” before the phrase “governmental intrusion” in order to make the privacy right as strong as possible.. Since the people of this state exercised their prerogative and enacted an amendment to the Florida Constitution which expressly and succinctly provides for a strong right of privacy not found in the United States Constitution, it can only be concluded ■ that the right is much broader in scope than that of the Federal Constitution. Winfield v. Div. of Pari-Mutuel Wagering, 477 So.2d 544, 548 (Fla. 1985); see N. Fla. Women’s Health & Counseling Servs., Inc. v. State, 866 So.2d 612, 634-35 (Fla. 2003). The right of privacy “ensures that individuals are able ‘to determine for themselves when, how and to what extent information about them is communicated to others.’” Shaktman v. State, 553 So.2d 148, 150 (Fla. 1989) (quoting A. Westin, Privacy and Freedom 7 (1967)). Specifically relevant here, we have held in no uncertain terms'that “[a] patient’s medical records enjoy a confidential status by virtue of the right to privacy contained in the Florida Constitution .... ” State v. Johnson, 814 So.2d 390, 393 (Fla. 2002). We have further recognized that “[t]he potential for invasion of privacy is inherent in the litigation process.” Rasmussen v. S. Fla. Blood Serv., Inc., 500 So.2d 533, 535 (Fla. 1987). This would not be the first time that a Florida court has balanced a decedent’s constitutional right to privacy over information occurring during the person’s lifetime against the right to access to that information in litigation. In Antico v. Sindt Trucking, Inc., 148 So.3d 163, 164 (Fla. 1st DCA 2014), which also involved a wrongful death action, the administrator of an estate raised a constitutional privacy challenge to discovery of the contents of the decedent’s cell phone. Specifically) the case involved a fatal automobile accident and the wrongful-death-action defendant filed a motion for permission to have an expert inspect the decedent’s cellphone for data from the day of the accident—data pertaining to “use and location information, internet website access history, email messages, and social and photo media posted and reviewed on the day of the accident.” Id. The administrator of the decedent’s estate “objected to the cellphone inspection citing the decedent’s privacy rights under the Florida Constitution.” Id. The trial court ultimately granted the motion to examine the cell phone, but recognized the decedent’s privacy interests and set very strict parameters for the expert’s confidential inspection. Id. at 164-65. Notwithstanding the strict parameters set by the trial court in Antico, the administrator of the estate filed a petition for writ of certiorari with the First District asserting that the trial court’s order departed from the essential requirements of law by'not granting stronger protections. Id. at 165-66. In exercising certiorari jurisdiction over the petition, the First District held that the irreparable harm component of its jurisdiction in that case was satisfied “because irreparable harm can be presumed where a discovery order compels production of matters implicating privacy rights.” Id. Thus, by exercising its certio-rari jurisdiction, the district court necessarily held that the decedent had an enforceable constitutional right to privacy in the litigation context. In denying relief from the highly limited grant of discovery over the cell phone’s contents, the Antico court noted that the trial court had adequately accounted for the decedent’s privacy right: The record here indicates that the trial court closely considered how to balance Respondents’ discovery rights and the decedent’s privacy rights. The order highlighted the relevance of the cellphone’s data to the Respondents’ defense and it set forth strict procedures controlling how the inspection process would proceed. [[Image here]] The other side of the equation—the countervailing privacy interest involved with the discovery of data on a cellphone—is also very important.... But we are satisfied that the order adequately safeguards privacy interests under the circumstances here where Petitioner was given the opportunity, but advanced no alternative plan. Id. at 166-67 (emphasis added). For emphasis, the Antico court performed its review of the discovery objection pursuant to the constitutional privacy right of the decedent. Id. at 164. (“Citing the privacy provision, article I, section 23, of the Florida Constitution, and the rules of civil procedure, the personal representative of Tabitha Antico’s estate (Petitioner) objects to an order entered by the trial court ... Petitioner objected to the cellphone inspect tion citing the decedent’s privacy rights under the Florida Constitution.” (emphasis added)). ■ Consistent with Antico, the decision below did not hold that Thomas did not have a constitutional right to privacy in his protected medical information. The district court specifically'rested its privacy analysis on waiver grounds: It is well-established in Florida ánd across the country that any privacy rights that might attach to a claimant’s medical information are waived once that information' is placed at issue by filing a medical malpractice claim. See, e.g., Barker v. Barker, 909 So.2d 333, 337 (Fla. 2d DCA 2005); Andreatta v. Hunley, 714 N.E.2d 1154, 1157 (Ind. Ct. App. 1999). Thus, by filing the medical malpractice lawsuit, the decedent’s medical condition is at issue. Weaver, 170 So.3d at 883. At no point did the district court hold that the decedent did not have a right to privacy. See generally id. Indeed, to the contrary, its waiver analysis was an implicit acknowledgement of that privacy right, as one cannot waive a right he or she does not have. No other basis was pffered for the First District’s holding as to the privacy issue. • Thus, we now make explicit what the decision below and Antico necessarily implied—in all litigation contexts, a decedent does not retroactively lose and can maintain the constitutional right to privacy that may be invoked as a shield in all contexts, including but not limited to medical malpractice cases, against the unwanted disclosure of protected private matters, including medical information that is irrelevant to any underlying claim including but not limited to any medical malpractice claim.[2] Death does not retroactively abolish the constitutional protections for privacy that existed at the moment of death. To hold otherwise would be ironic because .it would afford greater privacy rights to plaintiffs who survived alleged medical malpractice while depriving plaintiffs of the same protections where the alleged medical.malpractice was egregious enough to end the lives of those plaintiffs. This is an outcome that our Florida Constitution could not possibly sanction. Cf. Estate of Youngblood v. Halifax Convalescent Ctr., Ltd., 874 So.2d 596, 603-04 (Fla. 5th DCA 2004) (“Thus in a case such as this where the suit was filed before the nursing home-resident’s death; all deprivation of Chapter 400 rights, including those resulting in the death of a resident but not exclusive of those, should survive the death of the nursing home resident. A contrary interpretation would encourage nursing homes to drag out litigation until the nursing home resident dies—not an impractical solution given the age and state of health of most nursing home residents,” (internal citation, omitted)). Thus, we reiterate that Thomas and his estate, even after his death, maintained a constitutional right to privacy concerning matters that occurred prior to his death, and that privacy may be invoked as a shield to . maintain the confidence of his protected information, including but not limited to medical information.. But Dr. Myers contends that Thomas does not have a cognizable right to privacy because his constitutional rights retroactively totally vanished upon his death, and even if not, Weaver lacks standing to assert his privacy rights. Specifically, Dr. Myers strings together the following language in support of this sweeping contention: An individual’s right to privacy is personal and die's with the individual. Williams v. City of Minneola, 575 So.2d 683, 689 (Fla. 5th DCA 1991). “[E]ven where a constitutional right to privacy is implicated, that right is a personal one, inuring solely to individuals.” Alterra Healthcare Corp. v. Estate of Shelley, 827 So.2d 936, 941 (Fla. 2002). Thus, such privacy rights “may not be asserted vicariously.” Sieniarecki v. State, 756 So.2d 68, 76 (Fla. 2000). Moreover, this Court has declared unequivocally: “[W]e begin with the premise that a person’s constitutional rights terminate at death.” State v. Powell, 497 So.2d 1188, 1190 (Fla. 1986). Answer Br, at 45. However, Dr..Myers’ use of quotes out of context and incorrectly expanded arguments to suggest a retroactive absolution of the basic privacy right is both misleading and without effect. The very briefest of review of those cases reveals that it is Dr. Myers’ argument that is without life, not Thomas’ constitutional right to privacy. For . example, Dr. Myers .referred this Court to Williams, 575 So.2d at 689, for the proposition that a decedent has no right to privacy. However, Williams involved an action for damages arising from the alleged, invasion of privacy resulting from the re-, lease of autopsy .photos. Id. at 689-90. Thus, Williams involved, the tort of invasion of privacy on conduct occurring after death rather than the invocation of the constitutional right of privacy before death occurred.[3] Likewise, Sieniarecki, 756 So.2d 68, is wholly inapposite. Sieniarecki did not‘involve shielding information from disclosure. Instead, Sieniarecki involved a facial challenge by a defendant found guilty of neglect of a disabled adult, the disabled adult being her mother. See id. at 71-72. Thus, Sieniarecki contended that “because her mother had the right to refuse medical treatment, [she] cannot be convicted of neglect for failing to provide proper medical attention.” Id. at 76. We held that she could not assert a defense based on the privacy right of her mother to refuse medical treatment in that case because “constitutional rights are personal in nature and generally may not be asserted vicariously.” Id. However, invoking another person’s constitutional right to refuse medical treatment not for that person’s benefit, but to protect against criminal liability is quite different from invoking another person’s right to privacy to protect disclosure of that person’s constitutionally protected information for that person’s benefit. This is even more the case where the person has no effective avenue to preserve the right himself or herself. Indeed, in a footnote to the statement Dr. Myers quotes out of context, we recognized that there are other situations or “exceptions” that are more akin to the situation here: A recognized exception to this rule applies where enforcement of a challenged restriction would adversely affect the rights of non-parties,. and there is no effective avenue for them to preserve their rights themselves. Cf. Stall v. State, 570 So.2d 257, 258 (Fla. 1990) (“[assuming that the petitioners [who were alleged vendors of obscene materials] have vicarious standing to raise their customers’ privacy interest”). This principle has been extended' to apply where it is the petitioners who “stand to lose from the outcome of this case and yet they have no other effective avenue for preserving their rights” than by raising the constitutional rights of non-parties. Jones v. State, 640 So.2d 1084, 1085 (Fla. 1994) (recognizing petitioners’ vicarious standing to5 assert the claimed privacy rights of the underaged girls with whom they had sexual intercourse). Id. at 76 n.3 (emphasis added). Powell, 497 So.2d 1188, also provides no support. There, thie petitioners challenged a statute authorizing medical examiners to remove corneal tissue from a cadaver for use in a corneal transplant. Id. at 1190. Thus, in Powell, the issue of privacy was raised with' regard to conduct that occurred after the person’s death, not5 during his or her lifetime ás is the case here with Thomas Weaver’s medical care. Therefore, the quoted out of context language is presented in an attempt to bolster the incorrect argument. Still, in Powell, we also recognized that even with regard to rights after death, “[i]f any rights exist,’ they belong to the decedent’s next of kin.” Id. Likewise, the statement in Alterra that “even where a constitutional right to privacy is implicated, that right is a personal one, inuring solely to individuáis” is taken out of context because it involved a challenge to the standing of an employer to assert an employee’s constitutional-privacy rights. Alterra, 827 So.2d at 941. Here again the argument advanced failed to include the context in which the statement was made. > Finally, Dr. Myers further refers us to Nestor v. Posner-Gerstenhaber, 857 So.2d 953 (Fla. 3d DCA 2003), in which the administrator of an estate sought to enforce confidentiality agreements entered into between a decedent and his employees, signed just before his death. In Nestor, the district court referenced Williams in the contractual context and stated, “Privacy rights are personal and die with the individual.” 857 So.2d at 955. However, in the very next sentence, the district court reasoned that in the confidentiality agreement “there is no provision that, requires confidentiality after Posner’s death.” Id. Thus, Nestor is wholly inapposite as it pertains exclusively to a contractual privacy claim rather than a, constitutional privacy claim.. Indeed^ Nestor does not -even' contain any mention or reference to the Florida Constitution, let alone- the explicit fundamental constitutional right to privacy. Similarly unsupportive, Dr. Myers also refers us to Loft v. Fuller, 408 So.2d 619 (Fla. 4th DCA 1981), which is yet another invasion of privacy , case that fails to even mention the Florida Constitution, but rather is focused on the common law right to privacy and its use as a sword, rather than as a shield. Dr. Myers-further contends, that “the concept that an individual’s constitutional privacy rights expire upon, death is well accepted across the country,” and refers this Court to cases from various federal courts. Answer Br. at 46. However, not one of those cases supports that statement because every one of those cases involves conduct that occurred after the death of the person whose constitutional rights were at issue. See Silkwood v. Kerr-McGee Corp., 637 F.2d 743, 749 (10th Cir. 1980) (“We agree with the Ninth Circuit that the civil rights of a person cannot be violated once that person has died. It is clear then that the FBI agents could not have violated the civil rights of Silkwood by cover-up actions taken after her death.”) (emphasis added) (citations omitted); Whitehurst v. Wright, 592 F.2d 834, 840-41 (5th Cir. 1979) (“Here, the events of the alleged cover-up took place after Bernard Whitehurst had been shot and killed.... The question presented in the court below and in this court was whether events occurring after his death constituted a deprivation of her son’s constitutional rights for which plaintiff has stated a claim.”) (emphasis added) (footnote omitted); Ravellette v. Smith, 300 F.2d 854, 857 (7th Cir. 1962) (“These cases are inap-posite because they are concerned with a violation of the rights of a living person.’ In the instant case, decedent was dead when the sample was taken.”) (emphasis added); Helmer v. Middaugh, 191 F.Supp.2d 283, 285 (N.D.N.Y. 2002) (“As the allegations concerning Lt. Lisi are limited to conduct occurring after the death of B. Helmer, plaintiffs amended complaint does not allege a viable cause of action against him.”) (emphasis added). Indeed, some of those cases even support Weaver’s position. See Whitehurst, 592 F.2d at 840 (“No allegation was made that any conspiracy to kill Whitehurst or to cover up the event existed before the shooting took place.”) (emphasis added); Helmer, 191 F.Supp.2d at 285 (“In addition, because the proposed Second Amended Complaint alleges no additional facts to demonstrate Lt. Lisi’s involvement prior to the death of B. Helmer, it does not cure this fatal defect as to Lt. Lisi.”) (emphasis added). Therefore, not a single case that Dr. Myers has advanced stands for the broad, incorrect proposition that a person’s constitutional rights pertaining to conduct occurring during the person’s lifetime are retroactively destroyed upon death. Indeed, if Dr. Myers’ position were correct, there would be absolutely no protection and no one to ássert the protection. We must be ever vigilant as we consider invasions into the fundamental rights of our citizens, particularly when faced with flawed legal arguments. Today we specifically' address privacy, which is included among our most cherished rights such as speech, religion, to be free from searches and seizures without a warrant or permissible exception, and the right to due process. Surely, the reflex of any concerned jurist upon consideration of an invasion of fundamental rights would be to protect our citizens as required by our Bill of Rights. Dr. Myers’ contention here is that a person loses all of those rights upon death. Such a holding would render those rights hollow, chilling the daily operation of them on people as they navigate their lives from moment to moment. As discussed above, in Florida, the right to privacy is no less fundamental than those other rights and is even more closely guarded in some respects. Thus, the slippery slope Dr..Myers invites this Court to slide down is even more perilous with regard to the right to privacy. Indeed, just the potential for retroactive destruction of the right to privacy robs the life of that very protection due to the chill it would cause. If we were to follow Dr. Myers’ argument that a person experiences the loss of privacy applicable while living upon the change in status from alive to dead, then the secrets of that person’s life, including his or her sexual preferences, political views, religious beliefs, views about family members, medical history, and any other thought or belief the person considered to be private and a secret are subject to full revelation upon death. Theoretically, there would be no need for justification for such intrusions or revelations of a person’s secrets, not even a rational basis. Therefore, what would follow from allowing a retroactive destruction of the fundamental right to privacy is a reality in which ultimately anyone could rummage at any'time, without limitation, through every detail of every citizen’s most private information. Here, the right to privacy is being used as a limited shield from ex parte discovery and not as a sword to initiate a civil action. Thus, none of those cases asserted by Dr. Myers addressed the right of privacy before death in the specific context at issue here. While this may appear subtle, it is a very critical distinction. Failing to note this distinction, Dr. Myers’ selective readings of case law has led him to a misdiagnosis of Thomas’ right to privacy upon his death, a right that remains quite alive. The inquiry does not end here though. Dr. Myers also asserts that Weaver lacks standing to assert a right to privacy here. In Antico, the district court assumed that the estate had standing to assert the decedent’s privacy interests. 148 So.3d at 168 n.2 (“We needn’t resolve Respondents’ additional contention that Petitioner lacks standing in this case to assert the decedent’s constitutional privacy rights. The trial court didn’t pass on this question. And, as discussed above, relief isn’t warranted even if we assume (as this opinion does) that Petitioner can assert the decedent’s privacy rights.”). Here, in the decision below, the district court did not resolve the question of standing, and simply held that 'Weaver had waived the right to privacy by filing a medical malpractice wrongful death action. See Weaver, 170 So.3d at 883. Given that the issue of standing, must be considered in this case, unlike the Antico case, we address Dr. Myers’ challenge to Weaver’s standing. Despite the district court’s holding of waiver below, that waiver holding itself provides recognition and a basis for our holding here. Holding that Weaver waived the right of. privacy by filing the wrongful death action implies not only that Thomas Weaver-had a right to privacy in the litigation context that could be waived, but also that Emma Weaver, the administrator of his estate and his wife, had standing to waive such rights.. It follows that if she had standing to waive the right to privacy here, she likewise had standing to assert that privacy right. Similarly,-if a decedent has a constitutional privacy interest under the Florida Constitution in the context of discovery in litigation, as the Antico court'recognized,' then someone must' be able to assert that privilege. Florida’s Wrongful Death Act establishes the personal representative of a decedent’s estate as the sole party that may file a decedent’s cause of action for wrongful death. The statute provides in pertinent part: Thé action shall be brought by the decedent’s personal representative, who shall recover for the benefit of the decedent’s survivors and estate all damages, as specified in this act, caused by the injury resulting in death. When' a personal injury to the .decedent'results in death, no action for the personal injury ..shall survive, and any such.action pending at the time .of death- shall abate. § 768.20, Fla. Stat. (2016); see Roughton v. R.J. Reynolds Tobacco Co., 129 So.3d 1145 (Fla. 1st DCA 2013) (A wrongful death action may be-brought only, by the personal, representative for the benefit of the decedent's survivors and estate.); Fla. Emergency Physicians-Kang & Assocs., M.D., P.A. v. Parker, 800 So.2d 631, 633 (Fla. 5th DCA 2001) (same); Benson v. Benson, 533 So.2d 889 (Fla. 3d DCA 1988) (Decedent’s parents were without standing to file a wrongful death action where decedent’s wife, not decedent’s parents, served as administratrix of decedent’s estate.). Thus, if the right exists; which we conclude. it does, then it most assuredly must be capable of being advanced. Cf. In re Guardianship of Browning, 568 So.2d 4, 12 (Fla. 1990) (“Indeed, the right of privacy would be an empty right were it not to extend to competent and incompetent persons alike.”).- With regard to wrongful death actions, the administrator of the esr tate may certainly assert that right because he or she is the only person who has standing to file a wrongful death action in the first place. Moreover, Weaver’s status as wife may further entitle her to assert the right. Cf. Powell, 497 So.2d at 1190 (“If any rights exist, they, belong to the decedent’s next of kin.”) Based upon the foregoing, Weaver, as personal representative of Thomas’ estate and his wife, clearly has standing to challenge the provisions at issue by presenting the constitutional right to privacy in Thomas’ protected medical information. Dr. Myers further asserts that Weaver has necessarily waived all constitutional rights to privacy in this case by filing a claim of medical malpractice. However, the anatomy of such a waiver under Florida law is clear. Although a claimant may necessarily waive privacy rights to the medical information that is relevant-to a claim by filing an action, this does not amount to waiver of privacy rights pertaining to all confidential health information that is not relevant to the claim. See generally Poston v. Wiggins, 112 So.3d 783, 786 (Fla. 1st DCA 2013) (granting certiora-ri petition' and quashing trial court Order requiring production of post-accident medical records because “[u]nlike the pre-acci-dent pharmacy records which may be relevant, the post-accident medical records are entirely irrelevant”); McEnany v. Ryan, 44 So.3d 245, 247 (Fla. 4th DCA 2010) (granting certiorari petition and quashing trial court' order which denied petitioner-defendant’s objections to motion to compel; “In this case, whether defendant was impaired by a mixture of , the drug Ritalin and alcohol at the time of the accident would be a relevant issue. Determining whether petitioner had a current prescription for Ritalin seems to us to be relevant to that inquiry. It is equally apparent to us, however, that most of the medical records sought likely have no relevance to that inquiry, and no link was shown at the hearing.”); Barker, 909 So.2d at 338 (“By failing to provide for an in camera inspection of [the petitioner’s] medical'records to prevent disclosure of information that is not relevant to the litigation, thé discovery order departed from the essential requirements of the law.”). The decision below erred in holding otherwise to the extent unnecessary information would be open and subject to the ex parte exploration proceedings authorized in the 2013 amendments. Having determined that Weaver is a proper party to assert the constitutional right.to privacy in attempting to shield the disclosure of irrelevant, unnecessary, and protected medical information, and that she did not waive the protection with regard to medical information not relevant to the medical negligence action, we now address the question of whether the right to privacy has been violated. Due to the fundamental and highly guarded nature of this right, “any law. that implicates the .fundamental right of privacy, regardless of the activity,, is ..subject .to strict scrutiny and, therefore, presumptively unconstitutional.” Gainesville Woman Care, LLC v. State, 210 So.3d 1243, 1245 (Fla. 2017); Winfield, 477 So.2d at 547. Thus, the burden of proof rests with the State to justify an intrusion on privacy. Winfield, 477 So.2d at 547.[4] In an attempt to sustain the burden under the strict scrutiny test, Dr. Myers and the amici assert that the legislative intent behind the amendments is sufficient: to encourage settlement by providing equal access to relevant information, --resulting in the inexpensive and expeditious administration of justice; screening out frivolous claims; and streamlining medical malpractice litigation. However, none of these asserted interests, individually or collectively, are sufficiently compelling to outweigh the interest of a patient in keeping private medical information that, was given in confidence to medical personnel under the protections of both federal and Florida law when that information is not relevant to the prospective claim of malpractice. Moreover, even if those concerns were compelling, rather than address them with a steady hand and surgical precision such that the least intrusive means could be implemented, the amended statutes here have gashed Florida’s constitutional right to privacy. Requiring claimants to authorize clandestine, ex parte secret interviews is far from the least intrusive means to accomplish those stated goals.[5] The ex parte secret interview provisions of sections 766.106 and 766.1065 fail to protect Florida citizens from even accidental disclosures of confidential medical information- that falls outsidé the scope of the claim because there would be no one present on the claimant’s behalf to ensure that the potential defendant, his insurers, his attorneys, or his experts do not ask for disclosure of information, from- a former treating health care provider that is totally irrelevant to -the claim. This concern with regard to ex parte secret interviews has been noted not only by this Court but also by multiple other courts. See Acosta v. Richter, 671 So.2d 149, 153 (Fla. 1996) (“Were unsupervised ex parte interviews allowed, medical malpractice plaintiffs could not object and act to protect against inadvertent disclosure of privileged information, nor could they effectively prove that improper disclosure actually took place.”); see also Wenninger v. Muesing, 307 Minn. 405, 240 N.W.2d 333, 337 (1976); Nelson v. Lewis, 130 N.H. 106, 534 A.2d 720, 723 (1987); Crist v. Moffatt, 326 N.C. 326, 389 S.E.2d 41, 46 (1990); Alsip v. Johnson City Med. Ctr., 197 S.W.3d 722, 727 (Tenn. 2006); Kirkland v. Middleton, 639 So.2d 1002, 1004 (Fla. 5th DCA 1994); Horner v. Rowan Companies, Inc., 153 F.R.D. 597, 601 (S.D. Tex. 1994). While section 766.106 provides that a treating health care provider may have the right to refuse to be secretly interviewed ex parte, as noted by the Arizona Court of Appeals with .regard to a similar statute, a provider may nonetheless feel pressured to 'participate or not fully -understand his or her right to refuse: A physician may lack an understanding of the legal distinction between an informal method of discovery such as an ex parte interview, and formal methods of discovery such as depositions and [interrogatories], and may therefore feel compelled to participate in the ex parte interview. We also note that in Arizona, a substantial number of physicians are insured by a single “doctor owned” insurer. Realistically, this factor could have an impact on the physician’s decision. In other words, the physician witness might feel compelled to participate in the ex parte interview’because the insurer defending the medical malpractice defendant. may also insure the physician witness. Duquette v. Super. Ct., 161 Ariz. 269, 778 P.2d 634, 641 (Ariz. Ct. App. 1989). ■Furthermore, the supposed facilitation of settlement is not a reality for either party in medical malpractice litigation. As the Illinois appellate court opined, a secret ex parte interview with a- treating health care provider does not lead to the discovery of medical information that would not otherwise be discoverable, such that it facilitates settlement: ,It is not the ex parte conference in and of itself that leads to the early settlement of a case. Rather, it is the information that is obtained during that ex parte conference that leads to a case’s settlement. That ... information can be.obtained ... by obtaining a copy of the plaintiffs medical records or through a deposition of the plaintiffs treating physician. These latter methods will provide defense counsel with the same information that they would obtain in an -me parte conference ... without jeopardizing that physician’s fiduciary obligation to his patient. Petrillo v. Syntex Labs., Inc., 148 Ill.App.3d 581, 102 Ill.Dec. 172, 499 N.E.2d 952, 965-66 (1986). Under section 766.106(6)(b), the other informal discovéry tools available are un-sworn statements of the parties and treating health care providers (all with the claimant’s counsel allowed to be present), written questions, production, of documents and things, and physical and mental examinations. There is nothing to indicate that these tools are deficient in the acquisition of information’relevant to a potential medical malpractice claim, such that secret ex parte interviews justify the attendant risk of disclosure of irrelevant, constitutionally protected matters, .medical information and otherwise, or serve a compelling interest. See Winfield, 477 So.2d at 547. Therefore, the constitutional right to privacy has been violated in this case. The dissent is designed and constructed on a fundamentally flawed basis. The dissent further fosters confusion concerning this clear constitutional violation and is in-conflict with the practical realities of today’s litigation practice. With regard to medicine in the modern world of strained resources, the reality is that almost every malpractice litigant will be subject to the amendments’ no-notice interview provision because it is exceedingly difficult, if not impossible, to schedule time with a doctor within fifteen days or seventy-two hours absent a critical, life-threatening situation. See § 766.106(6)(b)5., Fla. Stat. (2016). The difficulty will surely become more pronounced when a doctor is advised that a patient seeks not an appointment for. care, but rather to schedule an interview regarding malpractice litigation against one of the doctor’s colleagues. Yet, if the malpractice litigant at any point does not schedule an interview within such narrow time frames, the defense may then repeatedly approach the doctors without any notice and ex parte. See id. Thus, when viewed through the lens of real-life implications, the statute’s facilitation of non-secret meetings is merely illusory. Sprinkled throughout the dissent is reference to the term “relevant” based on the deeply flawed premise that opposing counsel in litigation should be the sole and exclusive arbiter in a secret ex parte, non-recorded meeting of that which is “relevant” with regard to the precious Florida constitutional right of privacy. With this fatal flaw the dissent rings hollow. The dissent’s undue reference to the amendment’s use of thé word “relevant” renders strict scrutiny no different than rational basis scrutiny. History has demonstrated that bar grievance procedures are totally insufficient to protect our fundamental rights of privacy during secret meetings. On the contrary, even the conduct of lawyers in public proceedings is very often beyond proper limitations. Additionally, there is nothing to limit -the actions- of other investigators and insurance adjusters. Although the standard to be applied is whether there is a less invasive manner, a contrary interpretation advances the most invasive clandestine secret interrogations as a method to deal'with the fundamental constitutional right of our citizens. The dissént even relies on cases that support our holding and conclusions, when those cases are properly and fully analyzed. In Coralluzzo v. Fass, 450 So.2d 858 (Fla. 1984), superseded by statute, § 456.057, Fla. Stat. (2009); Hasan v. Garvar, 108 So.3d 570 (Fla. 2012); and Acosta, 671 So.2d 149, this Court was not presented with a constitutional privacy challenge. Thus, these' cases do not support the dissent’s reliance upon them for the proposition that litigants had no protections prior to the legislative' enactment of an eviden-tiary privilege. Indeed, because no constitutional privacy challenge was raised in any of those cases, this Court prudently did not make a single reference to the constitutional right to privacy. As a result, the statement in Coralluzzo that “[n]o law, statutory or common, prohibits—even by implication—[the unilateral, ex parte interviews],” 450 So.2d at 859, is wholly inappo-site “because of the dominant force of the Constitution, an authority superior to both the Legislature and the Judiciary.” Holley v. Adams, 238 So.2d 401, 405 (Fla. 1970). Therefore, the fact that the litigants in those cases did not raise a constitutional challenge does not render true the contrary view’s very disturbing conclusion that “there was nothing to prevent the ex parte interview with the nonparty treating physician in the absence of legislative protections.” Dissenting op. at 1146. This ill-founded conclusion confuses the concept of evidentiary privileges with fundamental Florida constitutional rights. The entire contrary argument falls when the confusion is analyzed and recognized. In an attempt to distract from this misdirection, the contrary view hinges on a clause in our decision in Acosta that “there was no legal impediment to ex parte conversations between a patient’s treating doctors and the defendants or their representatives.”. Dissenting op. at 1147 (quoting Acosta, 671 So.2d at 150). Conveniently, however, the dissent does not fully present the explanatory clause introducing that statement: “The present controversy has its genesis in Coralluzzo ,.where; in a medical malpractice action, this Court held there was no common law or statutory privilege of confidentiality as to physician-patient communications in Florida and, hence, there was no legal impediment Acosta, 671 So.2d at 150 (emphasis added). Thus, when considered-fully the critical fact is exposed and explained that Acosta and Coralluzzo simply did not involve a constitutional challenge whatsoever and did not have occasion to discuss any constitutional, “impediments.” It bears repeating to combat any obfuscation or confusion that just because the litigants did not raise the constitutional issue in prior cases does not mean the right was nonexistent. Likewise, to perpetrate that misconception, a failure of complete, analysis violates the tenet of constitutional avoidance this Court generally follows. Moreover, Coralluzzo was reviewed as a certified question of great public importance from a decision to deny a petition for writ of certiorari reviewing the denial of a protective order, and thus, all the courts involved in Coralluzzo were looking through an especially narrow lens focused on finding cléarly established law, not the creation of new rights, especially none that-the parties failed to raise. See Nader v. Fla. Dep’t of Highway Safety & Motor Vehicles, 87 So.3d 712, 723 (Fla. 2012) (“[Cjertiorari jurisdiction cannot be used to create new law where the decision below. recognizes the correct general law-and applies the correct law to a new set of facts to which it has not been previously applied. In such- a situation, the law at issue is not a clearly established principle of law.”); Coralluzzo, 450 So.2d at 858-59. Relatedly, the incident in Coralluzzo did not take place until 1981, just one year after the constitutional privacy right was adopted by the voters, and thus, without having' raised the issue, it is no surprise the constitutional limitation had not been considered with regard to ex parte conferences with medical providers. By contrast, the contrary view suggested does not accommodate' that in this case the constitutional right has been raised and fully briefed at all levels for de novo review. Unlike Acosta and Hasan, where the evidentiary privilege statutes at issue-were built upon only the spirit of the constitutional protections, thereby negating the need for a constitutional analysis, the amendments at issue today accomplish the opposite, affirmatively trampling on the constitutional privacy right and rendering it necessary, for the first time, to address the express constitutional issue. Moreover, selective references to Hasan and Acosta ignore the only analogous and relevant portions of those opinions, which actually support our holding today. Specifically, although both cases concerned statutory limitations on ex parte discovery, unlike the supreme constitutional right at issue here today, the statutory rights at issue in those cases involved analyses into the potential for revelation of protected information. Equally applicable here under the least intrusive means standard, the statutory analyses in Hasan and Acosta led this Court to “reject the contention that ex parte conferences with treating physicians may be approved so long as the physicians are not required to say anything. We believe it is pure sophistry to suggest that the purpose .and spirit of the statute would not be violated by such conferences.” Hasan, 108 So.3d at 578 (quoting Acosta, 671 So.2d at 156) (emphasis added). The fact that today we, analyze the constitutional right to privacy, as opposed to a limited statutory .evidentiary privilege, does not change our conclusion in Hasan that “efforts to foster an environment conducive to inadvertent disclosures of privileged information ... are impermissible.” Id. In referencing the language “purpose and spirit of the statute,” rather than the overall logic concerning overbreadth and illusory protections that applies equally under any good-faith strict scrutiny analysis, the contrary view expressed today simply changes the subject for discussion, rather than addressing the actual substance of the issues. Likewise, the lone decision relied upon by the dissent that even touches upon the constitutional right to privacy and its .application to ex parte medical interviews,, a district court decision, S & A Plumbing v. Kimes, 756 So.2d 1037, 1042 (Fla. 1st DCA 2000), does not control in any manner and is wholly inapposite when analyzed in context. Kimes involved ex parte interviews in the workers’ compensation context, which is wholly distinguishable from a medical malpractice action in that, as the ISmes court recognized, “The workers’ compensation system is clearly intended to be self-executing, with the resort to adversarial proceedings being undertaken only as a last recourse to resolve intractable disputes between petitioners and employers and their insurance carriers.” Id. at 1041 (emphasis added). Further, unlike workers’ compensation claims, medical malpractice- and wrongful death actions are completely adversarial and traditional actions at law resolved in the judicial branch by Article V courts.[6] Therefore, despite- any attempt to compare workers’ compensation to traditional litigation, this Court’s long saga of ensuring the scheme’s compliance with the right to access to courts undresses that disguised misconception. Accordingly, as the Kimes court accurately understood the substantial differences between workers’ compensation and traditional litigation, the fact that “[t]he workers’ compensation system transposed dispute resolution for workplace injuries from the private law of torts to a publicly administered and regulated system” was central to its conclusion that no legitimate expectation of privacy exists in the extremely limited workers’ compensation context with regard to interviews with physicians specifically hired for compliance with workers’ compensation. Id. at 1042 (emphasis added). The Kimes court further recognized the wholly different context of workers’ compensation when it concluded that “to accept Kimes’ absolute privacy argument would make it impossible to petition for, controvert and decide claims under the workers’ compensation law without resort to a system of litigation ..,. ” Id. (emphasis added). Yet, relying on the supposed purpose of the statute at issue here, the contrary view expressed today does not even acknowledge these differences. However, as already discussed, the purpose of the statute at issue here in potentially encouraging settlement and avoiding litigation is not only proven to be fleeting, but also has little bearing on our analysis because it is simply not the least intrusive means. Another very critical distinction arising from the workers’ compensation context of the Kimes decision is that the only medical professional to be interviewed was explicitly hired for purposes of workers’ compensation to evaluate the causal connection between the work perfpnned and the injury. Id. (“The very foundation of an employee’s right to receive benefits under the self-executing system in Chapter 440 requires a healthcare provider to assess the injury, establish a causal connection to the workplace accident, and, communicate that information to the employer’s insurance carrier.”). Yet, the contrary view does not include this aspect of the relationship and relies only on the fact that the physicians are treating physicians. While the dissent antagonizes the relevant focus here as a “misreading,” it ignores the fact that the constitutional analysis in Kimes focuses and relies specifically on the fact that the treating physicians were required to be hired under the narrow workers’ compensation framework. See id. at 1042 (“By presenting himself to be examined by a health care provider for the purpose not only for treatment for an injury, but also for evaluation of the injury and assessment of whether it is attributable to his employment, Kimes consented to the provider disclosing to the carrier medical information relating to the claim.”) (emphasis added). There is simply no comparison with the physicians hired specifically in the workers’ compensation litigation in the Kimes context and the physicians hired by Weaver in the ordinary context of seeking medical care without an eye to litigation. Ex parte interviews with a singular physician in a workers’ compensation claim with' regard to a specific employment injury are wholly different than conducting ex parte secret meetings with all of the medical professionals a person has visited completely of his or her own volition in the course of regular medical care during the last two years before the medical malpractice action accrued. In light of these distinctions, and the Kimes court’s finding of no expectation of privacy in the mandatory workers’ compensation medical visit, the Kimes court did not even have occasion to consider the least intrusive means aspect of our constitutional privacy test. In any event, relative to the broad net cast in this scenario, any potential waiver conclusion arising from Kimes is also severely limited by the fact that there was no threat of irrelevant information being disclosed in Kimes. Thus, Kimes, which concerned the administration of workers’ compensation claims, has absolutely no bearing on this wrongful death action, which is adversarial and subjects litigants to the full powers conferred on Article V courts. Although the misdirection created by the contrary view must be addressed to ensure there is no unnecessary confusion, in the end the attempt to apply workers’ compensation principles in this context is unavailing. Tellingly, not even Dr. Myers raised Kimes at any stage in this litigation. Returning to the salient issue, in light of the adversarial nature and full discovery process applicable to medical malpractice and wrongful death actions, the dissent has provided no reason to overcome the fact that the standard discovery procedures with notice and participation of all parties that áre employed daily without issue in thousands of cases are more than adequate to secure access to relevant information without trampling on the constitutional privacy rights of a Florida citizen plaintiff. The dissent misses the point when it suggests that a defendant would not even be interested in obtaining irrelevant medical information. Again, simply put, secret, ex parte non-recorded interviews conducted by adverse litigants, investigators or insurance adjusters are not the least intrusive means for gathering otherwise discoverable information. Further, to compel a person’s medical professionals to be placed in an environment conducive to even inadvertent disclosures of sensitive protected medical information violates the unambiguous constitutional “right to be let alone and free from governmental intrusion into the person’s private life.”- Art. I, § 23, Fla. Const. Even the possibility that a person’s extremely sensitive private medical information will be exposed is the type . of governmental intrusion that the Florida Constitution protects against because it is impossible to know if an inadvertent disclosure occurred when the meetings are not only ex parte and without a judge, but also secret without a record. In the case of protected medical information, the danger is uniquely and unconstitutionally great because once the bell has been rung, it cannot be unrung. It defies credibility to compare the physicians in this case to ordinary fact witnesses. Physicians, unlike ordinary fact witnesses, are governed by strict confidentiality through not only HIPPA, but also the constitutional right to privacy discussed at length today. Having determined that the statutory amendments impermissibly intruded on the fundamental and explicit constitutional right to privacy by the statutory requirements, the amendments cannot accomplish that end by conditioning the exercise of another highly guarded constitutional right on such submission in light of the constitutional prohibition. This protection from government coercion has been recognized by the United States Supreme Court in what is known as the unconstitutional conditions doctrine. See Koontz v. St. Johns River Water Mgmt. Dist., 570 U.S. 595, 133 S.Ct. 2586, 2595, 186 L.Ed.2d 697 (2013) (“[Rjegardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine forbids burdening the Constitution’s enumerated rights by coercively withholding benefits from those who exercise them.”). However, such' unconstitutional conditioning and coercion is exactly what the amendments to section 766.106 and 766.1065 have done here. As Weaver contends, the amended statutes at issue here coerce and force victims of medical malpractice into foregoing their fundamental and .explicit constitutional right to privacy to exercise their equally explicit and fundamental constitutional right to access to courts. The Florida Constitution provides that “[tjhe courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial .or delay.” Art. I, § 21, Fla. Const. We have explained that “each of the personal liberties enumerated in the Declaration of Rights ... is a fundamental right.” State v. J.P., 907 So.2d 1101, 1109 (Fla. 2004). “[C]ourts are generally opposed to any burden being placed on the rights of aggrieved persons to enter the courts because of the constitutional guarantee of access.” Bystrom v. Diaz, 514 So.2d 1072, 1075 (Fla. 1987) (quoting Carter v. Sparkman, 335 So.2d 802, 805 (Fla. 1976), receded from on other grounds, Aldana v. Holub, 381 So.2d 231 (Fla. 1980)). The seminal case for government action and the right of access to courts is Kluger v. White, 281 So.2d 1 (Fla. 1973). In Kluger, this Court explained the limitation on the power of the Legislature: [Wjhere a right of access to the courts for redress for a particular injury has been provided by statutory law predating the adoption of the Declaration of Rights of the Constitution of the State of Florida, or where such right has become a part of the common law of the, State pursuant to Fla. Stat. § 2.01, F.S.A., the Legislature is without power to abolish such a right without providing a reasonable alternative to protect the rights of the people, of the State to redress for injuries, unless the'Legislature can show an overpowering public necessity for the abolishment of such right, and no alternative method of meeting such public necessity can be shown. Id. at 4. At common law, Florida did not recognize a'cause of action for wrongful death; however, the Legislature authorized such an action prior to 1968. See Estate of McCall v. United States, 134 So.3d 894, 915 (Fla. 2014) (citing § 768.01, Fla. Stat. (1941)) (plurality opinion). Therefore, the access to courts provision of the Florida Constitution is applicable to wrongful death actions;' Although Kluger spoke in terms of total abolishment of a right, the scope of the protection extends to protect situations in which legislative action significantly obstructs'the right df access; [I]n order to find that a right has been violated it is' not necessary for the statute to produce a procedural hurdle which is absolutely impossible to surmount, only one which is significantly difficult. This is so because the Florida Constitution provides that' “[t]he courts - shall be open to every person for redress of Any injury, and justice shall be administered without sale; denial or de-Ray.” Art. I, § 21, Fla. Const. This “openness” and necessity that access be provided “without delay” clearly indicate that a violation occurs if the statute obstructs or infringes that right to any significant degree. Mitchell, 786 So.2d at 527. The First-District subsequently interpreted the word “significant” in the context of an access to courts challenge to mean “important” and “of consequence.” Henderson, 883 So.2d at 854. The facts demonstrate that the statutes challenged here would require Weaver to forfeit the constitutional right to privacy and expose her late husband’s medical and other information (and potentially hers)[7] up to two years prior to the alleged act of medical negligence, regardless of its relevance to her claim to prying lawyers, insurance companies, experts, and doctors to probe, as a condition to filing a wrongful death action. Moreover, the mandatory authorization and secret, ex parte interview provisions empower these individuals and entities to 'actively engage nonparties in unsupervised interviews without the presence of the claimant, the claimant’s representative, or the claimant’s attorneys, potentially leaving exposure of irrelevant and constitutionally protected- private information otherwise undiscoverable and nearly impossible to address. Cf. Rasmussen, 500 So.2d at 537 (“Howevér,' the subpoena in question gives petitioner access to 'the names and addresses of the blood donors with no restrictions on their use. There is nothing to prohibit petitioner from conducting an investigation without the knowledge of the persons in question. We cannot ignore, therefore, the consequences of disclosure to nonparties, including the possibility that a donor’s coworkers, friends, employers, and others may be queried as to the donor’s sexual preferences, drug use, or general life-style.”). The vulnerable state in which a medical malpractice claimant is placed is a sufficiently important and significant impediment to seeking relief from a Florida court.[8] This our Constitution simply does not allow.[9] ’ Having determined that the 2013 amendments to sections 766.106 and 766.1066 of the Florida Statutes are unconstitutional, we now must undertake consideration as to whether to sever the unconstitutional portions. See Ray v. Mortham, 742 So.2d 1276, 1280 (Fla. 1999) (“Sever-ability is a judicial doctrine recognizing the obligation of the judiciary to uphold the constitutionality of legislative enactments where it is possible to strike' only the unconstitutional portions.” (citing State v. Calhoun Cty., 126 Fla. 376, 170 So. 883, 886 (1936))). Although the 2013 act that amended the statutes did not include a severance clause, this presents no barrier. See Fla. Hosp. Waterman, Inc. v. Buster, 984 So.2d 478 (Fla. 2008). In Waterman, we explained the questions that guide our severance analysis: . (1) [Wjhether the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void; (2) if the good and bad features are not inseparable and if the Legislature would have passed one without the other; and (3) whether an act complete in itself remains after the invalid provisions are stricken. Id. at 493 (citing Moreau v. Lewis, 648 So.2d 124, 128 (Fla. 1995)). Noting the limited nature of our holding today and our severance principles, we make two strikes from the amended statutes. First, wé strike in its entirety section 766.1065(3)E., Florida Statutes (2013), which contains the constitutionally infirm language: “This authorization expressly allows the persons or class of persons listed in subsections D.2.-4. above to interview the health, care providers listed in subsections B.1.-2. above, without the presence of the Patient or the Patient’s attorney.” § 766.1065(3)E., Fla. Stat. Second, we strike the last sentence from- section - 766.106(6)(b)5., Florida Statutes (2013), which contains the constitutionally infirm language: “If the claimant’s attorney fails to schedule, an interview, the prospective defendant or his or her legal representative may attempt to conduct an interview without' further notice to the claimant or the claimant’s legal representative.” § 766.106(6)(b)5., Fla. Stat.' CONCLUSION In sum, we hold today that the right to privacy in the Florida Constitution attaches during the life of a citizen and is not retroactively destroyed by death. Here, the constitutional protection operates in the specific context of shielding irrelevant, protected • medical history and other private information from the medical malpractice litigation process. Furthermore, in the -wrongful death context, standing in the position of the decedent, the administrator of the decedent’s estate has standing to assert the decedent’s privacy rights. Finally, the Legislature unconstitutionally conditioned a plaintiffs right of access to courts for redress of injuries caused by medical malpractice, whether in the wrongful death or personal injury context, on the claimant’s waiver of the constitutional right to privacy. Therefore, we strike certain unconstitutional language from the 2013 amendments to sections 766.106 and 766.1066 of the Florida Statutes which authorized secret, ex parte interviews. We quash the decision below and remand for further proceedings consistent with this opinion. It is so ordered. LABARGA, C.J., and PARIENTE, and QUINCE, JJ., concur. CANADY, J., dissents with an opinion, in which POLSTON and LAWSON, JJ., concur. . An amicus brief by the Florida Justice Association has been filed in support of Weaver. Amicus briefs by the State of'Florida, the Florida Justice Reform Institute, and the Florida Hospital Association/Florida Medical Association/American Medical Association have been filed in support of Dr. Myers. . In a related context, application of existing limits and exemptions to access to information by the public bolsters this conclusion. For instance, in the context of the federal Freedom of Information Act, the families of deceased astronauts- from the Challenger space shuttle explosion were allowed to claim an exemption for “personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.” New York Times Co. v. Nat'l Aeronautics & Space Admin., 782 F.Supp. 628, 630 (D.D.C. 1991). In another context, it is well-established law that the right to privacy survives death. Florida recognizes both a statutory and common law right of publicity. § 540.08, Fla. Stat. (2016); see, e.g., Cason v. Baskin, 155 Fla. 198, 20 So.2d 243, 245 (Fla. 1944). The right of publicity is a corollary right derived from the right to privacy that allows a person to control the use of his or he^ name and likeness. Section 540.08, Florida Statutes, authorizes the surviving spouse of a, decedent to enforce the decedent’s publicity rights for up to forty years. See § 540.08(1), (5)-(7). Thus, it is clear that the right to privacy survives a person's death, "is not retroactively-destroyed by death, and remains enforceable in tort law by the decedent’s family members for decades. , Moreover, even in this distinct context, the Williams court recognized that there are certain exceptions in which a decedent’s next of kin may properly bring an action for invasion of privacy. 575 So.2d at 689. . Dr. Myers contends that he is not a government actor, and therefore, the right to privacy challenge fails. However, this Court has previously considered challenges to statutes on the basis that they violate the right to privacy where both parties to the action are. private individuals, but one party benefits from opér-ation of the statute. See, e.g., D.M.T. v. T.M.H., 129 So.3d 320, 330 (Fla. 2013) (donor filed petition to establish parental rights and sought declaration of constitutional invalidity of assisted reproductive technology statute); Von Eiff v. Azicri, 720 So.2d 510, 511-12 (Fla. 1998) (parents challenged statute which provided grandparents with a freestanding cause of action for visitation rights with minor grandchildren); Beagle v. Beagle, 678 So.2d 1271, 1273 (Fla. 1996) (parents contested grandparents’ petition for visitation rights with grandchild that was authorized pursuant to statute). . Further, although not at issue here, requiring potential claimants to list by name health care providers who do not have information potentially relevant to the claim, and provide dates of service, see § 766.1065(3)C., in and of itself reveals irrelevant private medical information. For example, if a claimant seeks to file an action based upon alleged malpractice by a podiatrist, the authorization requires him to report if he was seen by a health care provider who specializes in treating HIV, or sexual dysfunction, or depression, or substance abuse. This goes beyond the scope of the claim and intrudes upon a person's right to keep' private medical information that has not been placed at issue by virtue of the action. However; again, this is not at issue here and must also be weighed against the limiting intent behind the requirement. . Further supporting our holding today, the Kimes court even rioted that the moment a workers' compensation claim becomes sufficiently adversarial by appointment of an expert medical advisor, ex parte conferences are no longer permissible. See Kimes, 756 So.2d at 1041 (citing Pierre v. Handi Van, Inc., 717 So.2d 1115, 1117 (Fla. 1st DCA 1998)), Pierre even noted the impropriety that would flow from ex parte discussions once a matter becomes adversarial: Once disputes hávé arisen arid ripened, however, requiring the assistance of [expert medical advisors], the case has become indisputably adversarial so that ex parte discussions with such experts are not.appropriate ... and the experts.so chosen.should not be subject to even the "appearance of impropriety,” which would result frorn private meetings with either party. 717 So.2d at 1117. . Weaver also raised a challenge based on her own right to privacy on the theory that her husband potentially revealed ■ information about her and her medical history during the course of liis medical care. In light of our holding today, however, we need not address this claim. . Dr. Myers contends that the impediment at issue is merely the procedural act of filling out and executing the authorization, which in turn is not a significant infringement. Indeed, we have previously upheld conditions precedent to filing a legal action so long as the condition is not "significantly difficult” to surmount. For example, in Warren v. State Farm Mutual Automobile Insurance Co., 899 So.2d 1090, 1092 (Fla. 2005), the challenged statute required providers of non-emergency medical services and medical services not provided in a hospital to submit a statement of charges to insurers within thirty days of service or be subject to automatic claim denial. This Court held that the statute did not violate access to courts because it did not abolish the rights of medical providers to file claims for certain insurance benefits and was a reasonable, condition precedent to filing such claims. Id. at 1097. However, viewing the amendments merely in terms of filling out an authorization is a superficial way to perceive and ignore their effect. As we have made clear, this is not about paperwork, but privacy. . In light of our holding today, we need not reach Weaver’s other contentions that the 2013 amendments violated separation of powers and the prohibition against special laws under the Florida Constitution.